**UNITED STATES of America**
v.
**Murray COHEN and Bette Louise Renner.**

**UNITED STATES of America**
v.
**BALTIMORE ALUMINUM PRODUCTS CORPORATION, Nicholas Schipani and Granville Palmer Berryman.**

**UNITED STATES of America**
v.
**James C. PRICE.**

**UNITED STATES of America**
v.
**Willie SPEIGHT and Frank J. Wright.**

**UNITED STATES of America**
v.
**James C. PRICE, James Carl Hollingsworth and Patricia Lee Hollingsworth.**

**UNITED STATES of America**
v.
**PIONEER BUILDERS, INC. and Joseph B. Bahen, Jr.**

**UNITED STATES of America**
v.
**John FELKNER, Jr. and Stanley Leonard Sonner (two cases).**

**UNITED STATES of America**
v.
**John Joseph DiTOMMASO.**

**UNITED STATES of America**
v.
**Charles Forest WAUGAMAN.**

**UNITED STATES of America**
v.
**Charlie Lenwood BUTLER.**

**UNITED STATES of America**
v.
**Harry FRID.**

**UNITED STATES of America**
v.
**William Vincent BROOKHART, Jr.**

**UNITED STATES of America**
v.
**Charles Francis FRAZIER.**

**UNITED STATES of America**
v.
**Clifton Amos REED.**

Crim. Nos. 26402, 27102, 27135, 27323, 27435, 27439, 27509, 27533, 27561, 27565, 27568, 27584, 27594, 27601, 27622.

United States District Court
D. Maryland.
Oct. 27, 1967.

726

Arnold M. Weiner and Robert E. Cahill, Baltimore, Md., for defendants in Criminal Nos. 27135 and 27435.

C. M. Zacharski, Jr., Herbert R. O'Conor, Jr. and Francis X. Pugh, Baltimore, Md., for defendants in Criminal No. 27439.

Decatur H. Miller and Albert S. Barr, III, (court-appointed) Baltimore, Md., for defendant in Criminal No. 27565.

Harold Buchman (court-appointed), Baltimore, Md., for defendant in Criminal No. 27568.

Robert E. Cahill (court-appointed), Baltimore, Md., for defendant in Criminal No. 27594.

Alan H. Murrell and James W. Murphy, Baltimore, Md., for defendant in Criminal No. 27601.

Joseph Rosenthal and Norman N. Yankellow, Baltimore, Md., for defendant in Criminal No. 27622.

Before THOMSEN, Chief Judge, and NORTHROP and KAUFMAN, District Judges.

FRANK A. KAUFMAN, District Judge.

In these criminal cases, the defendants have filed motions to dismiss, alleging that the indictments were returned by grand juries constituted in violation of 28 U.S.C. § 1861 [1] and of the Fifth and Sixth Amendments to the Constitution of the United States. In most of these cases, counsel contend, in almost identical language, that the indictment was returned by a grand jury which "was selected improperly pursuant to the so-called 'key man' system, and in accordance with standards not authorized by law." Counsel cite 28 U.S.C. § 1861, Rabinowitz v. United States, 366 F.2d 34 (5th Cir. 1966), and Hart, The Case for Federal Jury Reform, 53 A.B.A. Journal 129 (1967).[2]

Arthur G. Murphy, First Asst. U. S. Atty., Thomas P. Curran, Asst. U. S. Atty., for plaintiffs in all cases.

Arnold M. Weiner, Baltimore, Md., for defendants in Criminal Nos. 26402, 27102, 27323, 27509, 27533, 27561 and 27584.

---

1. See n. 7 infra.

2. In Criminal Nos. 27439, 27509 and 27533, the defendants contend that "the indictment was returned by a Grand Jury which was constituted in violation of the Statutes and Constitution of the United States," citing *Rabinowitz*, 28 U.S.C. § 1861, and the Fifth and Sixth Amendments.

In Criminal No. 27565, involving the defendant Waugaman, it is contended

In one of the cases, the defendant Butler has questioned not only the method of selection of the grand jury which indicted him but also selection procedures in this Court with respect to petit juries.[3] This Court, in this opinion, will address itself to the attack upon the selection procedures in connection with both grand and petit juries.[4]

Counsel for defendants requested, and were given the opportunity, to examine the records of the Clerk and Jury Commissioner of this Court relating to a period of five years—including the questionnaires returned by prospective jurors —and to interview the Clerk, the Jury Commissioner and former jurors. A hearing was held,[5] and the Court heard testimony from witnesses called by defense counsel who included a statistician, a sociologist, and an attorney connected with the University of Chicago Jury Project; and from the Clerk of this Court and Judge R. Dorsey Watkins, who were called by the Government. Judge Watkins has been the Judge of this Court designated to confer with the Clerk on jury selection problems. However, that subject has also been discussed from time to time at the weekly meetings of the Judges of this Court, particularly during the last year when the possibility of obtaining a cross-section of the community from voting lists, telephone directories and other sources has been considered, and a greater use of various random sources has been suggested to the Clerk. Until recently, the Clerk and the Jury Commissioner had relied largely on "key-men," and had followed carefully the recommendations, including the form of letter to "key-men," contained in the Report of the Judicial Conference on the Operation of the Jury System, presented to the Judicial Conference of the United States in 1959 by its Committee on the operation of the Jury System, chaired by Chief Judge Harry E. Watkins of the Northern District of West Virginia, and approved by the Conference in September, 1960. 26 F.R.D. 409 et seq. (1960). That Report is sometimes hereinafter referred to as "the 1959 Conference Report." [6]

that the "manner of selecting juries in the District of Maryland violated the statutory and constitutional standards prescribed for the selection of Jurors. The illegal selection of Jurors entitles the Defendant to re-indictment and a new trial by a properly-selected Jury."

3. In Criminal No. 27568, Butler apparently drew up his own motion to dismiss, asking *inter alia:*
"Were they any Negro's [sic] on the Grand Jury"?;
"Was [sic] the Grand and Petite [sic] juries selected from cross city references (Rich and Poor)"?;
"Was the Grand Jury selected Constitutionally"?.

4. In Criminal No. 27565, at the request of the defendant Waugaman, the Court asked voir dire questions as to whether any venireman, or any of his relatives, was ever employed by any Government agency, or by any law enforcement or investigative agency, or by any bank. Waugaman also requested and was accorded the opportunity to present his arguments orally to the Court in proper person, in addition to having his court-appointed counsel participate fully in the hearing in these cases. Waugaman, *in-ter alia,* raised questions concerning the number of Government employees and/or bank employees who were among the veniremen or on the jury itself. This Court finds no merit in any of those contentions and will confine itself in this opinion to the broader attacks on the jury system and its administration in this Court.

5. Each defendant in these cases was represented by counsel. All counsel were afforded the opportunity to appear and to be heard in these proceedings. Certain counsel participated fully and actively and presented written and oral arguments to the Court. Other counsel specifically and affirmatively stated to the Court that they submitted the issues raised on the record and on those written and oral arguments. The Court desires to comment that the cases were carefully, fully and completely presented on both sides.

6. The 1959 Conference Report is discussed in Pope v. United States, 372 F.2d 710, 722 (8th Cir. 1967); United States v. Hunt, 265 F.Supp. 178, 181–185 inclusive, 187 (W.D.Tex.1967); United States v. Duke, 263 F.Supp. 828, 837 (S.D.Ind. 1967).

Because of the importance of the issues presented, Chief Judge Thomsen of this Court assigned three judges to hear and decide these cases. At the hearing, counsel conceded that there has been no deliberate or intentional discrimination against any group, and that there has been no discrimination or disproportion with respect to race, religion, or political affiliation. In fact, the evidence shows that the Clerk and the Jury Commissioner achieved almost perfect proportions with regard to those three classifications.

Noting the distinction between state and federal cases and emphasizing that the supervisory duties imposed upon this and every other federal court by the Constitution and by the Congress pursuant to 28 U.S.C. §§ 1861–1865,[7] exceed those

7. The statutory provisions concerning the selection of jurors in the federal courts and related matters are set forth in 28 U.S.C. §§ 1861–1874. Sections 1861–1865, inclusive, which have more application with regard to the issues in these cases than the following sections, provide:

§ 1861. Qualifications of Federal jurors

Any citizen of the United States who has attained the age of twenty-one years and who has resided for a period of one year within the judicial district, is competent to serve as a grand or petit juror unless—

(1) He has been convicted in a State or Federal court of record of a crime punishable by imprisonment for more than one year and his civil rights have not been restored by pardon or amnesty.

(2) He is unable to read, write, speak, and understand the English language.

(3) He is incapable, by reason of mental or physical infirmities to render efficient jury service.

§ 1862. Exemptions

The following persons shall be exempt from jury service:

(1) Members in active service in the armed forces of the United States.

(2) Members of the Fire or Police departments of any State, District, Territory, Possession or subdivision thereof.

(3) Public officers in the executive, legislative or judicial branches of the government of the United States, or any State, District, Territory, or Possession or subdivision thereof who are actively engaged in the performance of official duties.

§ 1863. Exclusion or excuse from service

(a) A district judge for good cause may excuse or exclude from jury service any person called as a juror.

(b) Any class or group of persons may, for the public interest, be excluded from the jury panel or excused from service as jurors by order of the district judge based on a finding that such jury service would entail undue hardship, extreme inconvenience or serious obstruction or delay in the fair and impartial administration of justice.

(c) No citizen shall be excluded from service as grand or petit juror in any court of the United States on account of race or color.

§ 1864. Manner of drawing; jury commissioners and their compensation

The names of grand and petit jurors shall be publicly drawn from a box containing the names of not less than three hundred qualified persons at the time of each drawing.

The jury box shall from time to time be refilled by the clerk of court, or his deputy, and a jury commissioner, appointed by the court.

Such jury commissioner shall be a citizen of good standing, residing in the district and a well known member of the principal political party in the district, opposing that to which the clerk, or his deputy then acting, may belong. He shall receive $5 per day for each day necessarily employed in the performance of his duties.

The jury commissioner and the clerk, or his deputy, shall alternately place one name in the jury box without reference to party affiliations, until the box shall contain at least 300 names or such larger number as the court determines.

This section shall not apply to the District of Columbia.

§ 1865. Apportionment within district; additional jury commissioners

(a) Grand and petit jurors shall from time to time be selected from such parts of the district as the court directs so as to be most favorable to an impartial trial, and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service. To this end the court may direct the maintenance of separate jury boxes for some or all of the places

imposed by the Constitution with regard to state courts,[8] counsel for defendants challenge the underlying procedures of jury selection followed in this Court. In addition, counsel assert that if those procedures are not themselves violative of required standards, their application has been so faulty as to require the dismissal of the indictments in these cases. For the reasons stated in this opinion, this Court denies the motions to dismiss in each of these cases and holds that the jury selection system in this Court and the empanelling of the juries involved in these cases are in accordance with Constitutional and existing statutory commands.

## I.

For a number of years, the following procedures, with certain recent amplifications referred to in this opinion, were followed in selecting jurors to serve on the grand and petit juries in this Court:

(1) The Clerk of this Court and the Jury Commissioner of this Court were responsible for obtaining the names of persons to serve as federal jurors. The practice of the Clerk was to obtain the names of prospective jurors (a) by selecting the names himself from sources such as telephone directories, city and county directories, membership lists of clubs and civic groups, and other sources, and (b) by communicating with certain persons, such as ministers, priests and rabbis, state officials, county court clerks, registers of wills, supervisors of elections, and labor leaders, and requesting such persons to submit the names of prospective jurors. The Jury Commissioner followed the practice of obtaining names of prospective jurors by requesting certain persons to act as "key men" and to submit the names of prospective jurors. The Jury Commissioner was personally acquainted with all of the "key men" used by him. The Clerk was personally acquainted with very few of the persons whom he requested to suggest the names of prospective jurors. The names of 35%–40% of those persons to whom questionnaires were sent were supplied by "key men" personally known to either the Clerk or the Jury Commissioner; the names of 20%–25% of those persons to whom questionnaires were sent were taken by the Clerk from the sources mentioned under (a) supra; the names of the remaining 35%–45% of those persons to whom questionnaires were sent were supplied by the "suggestors" mentioned under (b) supra.

(2) Both the Clerk and the Jury Commissioner, in communicating with the persons asked to submit lists of prospective jurors, used the form letter attached as Exhibit 3 to the 1959 Conference Report.

(3) Prospective jurors whose names were obtained through the return of lists or through direct selection by the Clerk were sent a questionnaire in the form substantially the same as the form attached as Exhibit 1 to the 1959 Conference Report. When the questionnaires were returned, they were filed by political subdivision (counties and Baltimore City) in the order received.

(4) When the names of additional prospective jurors were needed for addi-

for holding court in the district and may appoint a jury commissioner for each such place.

(b) Grand or petit jurors summoned for service at one place for holding court in a district may, if the public convenience so requires and the jurors will not be unduly burdened thereby, be directed to serve at another place in the same district.

8. In Fay v. People of State of New York, 332 U.S. 261, 287, 67 S.Ct. 1613, 1627, 91 L.Ed. 2043 (1947), the Supreme Court observed:

Over federal proceedings we may exert a supervisory power with greater freedom to reflect our notions of good policy than we may constitutionally exert over proceedings in state courts, and these expressions of policy are not necessarily embodied in the concept of due process.

See also Dow v. Carnegie-Illinois Steel Corporation, 224 F.2d 414, 423 (3d Cir. 1955); United States v. Dennis, 183 F.2d 201, 222 (2d Cir. 1950).

tion to the jury box, the Clerk removed the questionnaires from the files on the basis of "first in-first out." The Clerk examined the drawn questionnaires to determine whether each prospective juror met the statutory qualifications for jury service. Pursuant to oral in-instructions from the Court, the Clerk eliminated certain classes of persons, including doctors, lawyers, dentists, nurses, school teachers and persons whose questionnaires were returned with a doctor's certificate that the person was unable to serve as a juror. Questionnaires not eliminated by the Clerk were sent to the Jury Commissioner for his review. With rare exceptions, the questionnaires were all approved for deposit by the Jury Commissioner. The questionnaires were used to prepare slips for deposit in the jury box. These slips contained the name, age, address and occupation of the prospective juror and his or her spouse's name and occupation. The slips were deposited alternately by the Clerk and the Jury Commissioner so that the new deposits when added to those already in the jury box resulted in 400–600 names being in the box.

(5) The names of prospective jurors were deposited and drawn four times each calendar year. Grand and petit juries were organized for the terms of this Court beginning in March, June, September and December of each year.

(6) The names of 40–45 prospective grand jurors and 175–225 prospective petit jurors were drawn at random from the box by the United States Marshal in open court. The Clerk sent each prospective petit juror a summons in the form attached as Exhibit 6 to the 1959 Conference Report, and a similar form was sent to each prospective grand juror. Letters from prospective jurors requesting to be excused from service were received by the Clerk, who reviewed them and made recommendations as to whether excuses should be granted. The Court decided whether an excuse was to be granted.

These procedures have been recently amplified and expanded to include additional random selection methods, in accordance with the recommendations of the Judicial Conference of the United States.

Since 1942, a Committee of the Conference, known as the Committee on the Operation of the Jury System, has been at work. In 1942, the Committee, then chaired by Chief Judge John C. Knox of the Southern District of New York, reported to the Conference (at p. 13 of the Committee's 1942 report):

It is the sense of the Committee that jurors to serve in the district courts of the United States should be drawn from every economic and social group of the community without regard to race, color, or politics, and that those chosen to serve as jurors should possess as high a degree of intelligence, morality, integrity, and common sense, as can be found by the persons charged with the duty of making the selection.[9]

In 1959 the Committee submitted a report comprising nearly 140 pages. Certain excerpts from that report seem particularly relevant in the context of the challenges in these cases. To begin with, the report stated that the following conclusions are of "paramount importance":

The jury holds in its collective hands the life, the liberty and the welfare of individual defendants in criminal cases and the interests of litigants in civil cases. The importance of improving the calibre of these judges of the facts is therefore self evident. At the same time, jurors must be representative of the community in which they live. Therefore, the Committee recommends that the sources from which they are selected should include all social and economic groups in the community and the jury list should represent as high a degree of morality, integrity, intelligence and common sense as the

9. In the 1959 Conference Report the footnote number is "6" and reads: "Knox Report, p. 13."

jury commission can find in each social and economic group by the use of impartial methods of selection.

To make the selection representative, all groups in the community should be included in the sources from which the list is chosen; women, now everywhere eligible in the United States district courts, should be used; volunteers for jury service should be refused, and economic and social status, including race and color, should not be considered, except to prevent discrimination. The freedom of choice is now much greater than formerly because the qualifications and exemptions of jurors prescribed by state law are no longer applicable in the federal courts.

In order to get better jurors, the Committee recommends greater care in the compilation of the list of jurors whose names go into the jury wheel or box from which trial jurors are chosen. To bring this about it recommends legislation putting the court in control of the selection of names, and providing that the commission, consisting of the jury commissioner and the clerk, should operate under the direction of the court, that questionnaires should be used to supply information as to the qualifications of jurors, that where feasible the questionnaires should be supplemented by personal interviews and finally that full-time jury commissioners may be appointed where needed, with the approval of the Judicial Conference. [26 F.R.D. at 419].

The Committee set forth twenty-one specific recommendations, including, *inter alia,* at 26 F.R.D. 409 at 421–422:

I. In order that grand and petit jurors who serve in United States district courts may be truly representative of the community, the sources from which they are selected should include all economic and social groups of the community. The jury list should represent as high a degree of intelli-gence, morality, integrity, and common sense as possible.

II. The choice of specific sources from which names of prospective jurors are selected must be entrusted to the clerk and jury commissioner, acting under the direction of the district judge, but should be controlled by the following considerations: (1) the sources should be coordinated to include all groups in the community; (2) economic and social status including race and color should be considered for the sole purpose of preventing discrimination or quota selection; (3) women are now eligible by law for jury service in federal courts and they should be selected and called to serve without discrimination on account of sex; (4) political affiliation should be ignored; (5) generally speaking, unsolicited requests of persons who seek to have their names placed upon jury lists should be denied and unsolicited recommendations of names should not be recognized; and, (6) in determining the parts of the district from which jurors are to be drawn,[10] the courts should bear in mind the desirability of conserving the time of jurors and preventing exorbitant travel expense to the government.

III. The statutory requirement that federal courts must observe the qualifications and exemptions prescribed for jurors in the state courts has been abandoned, and jurors should now be called without regard to state qualifications.

\* \* \* \* \* \*

VIII. Exclusion from the jury panel or from jury service of classes or groups should be done only with due care and solely by a formal written order of the court.

\* \* \* \* \* \*

X. Waste in the time of the jurors and in government funds can be avoided. This can be accomplished in most multiple-judge courts by placing in the

10. In the 1959 Conference Report the footnote number is "2" and reads: "See 28 U.S.C.A. § 1865(a)."

chief judge, or a judge designated by him, assisted by the jury commission, the responsibility for the administration of jury selection, and of the assignment of jurors. In metropolitan districts, jury pools can be used to advantage and will promote the juror's comfort as well as economy of operation.

\* \* \* \* \* \*

XIII. The accommodations of courthouses should be such that jurors are not required to wait in corridors and crowded anterooms to be called for service. If a jury pool system is used, suitable and comfortable waiting rooms should be provided. Adequate arrangements for the comfort of women jurors should be provided and no juror should be kept waiting in reserve beyond the time when it can be ascertained that he will not be needed for that day.

\* \* \* \* \* \*

With regard to standards of selection and sources of names, the Committee commented:

\* \* \* [A]dministrative problems in selecting the source from which names of prospective jurors shall be secured still remain. Indeed, since fewer people are disqualified or exempted under the new statutory standards, and wider discretion in selection can now be exercised, these problems may even be greater. The sources of names used today do not seem to differ materially from those used in 1942, viz., voting lists, city directories, telephone directories, tax rolls, membership lists of associations and organizations of all kinds, and "key men" who have been asked to make suggestions. As new lists are substituted for the old ones, groups which have recently become eligible

(like women in some districts) should be adequately represented, and doubtless will be. That is a matter within the control of jury commissioners and clerks, subject of course to the general supervision of the courts.

The Knox Report described and made recommendations with respect to these administrative problems but did not attempt to prescribe legislation which would control local discretion. Said the report:

> The choice of means by which all sections of society are to be reached, in the opinion of the Committee, is one which must be entrusted to the sound discretion of the court of each district. The Federal judicial system embraces such a variety of local conditions that uniform details of administration to suit the differing social and economic structures of the 85 districts would be impossible to devise or apply.[11]

With this statement, we agree.

That the district courts are generally exercising their discretion properly is attested by the fact that the decisions of the Supreme Court reveal only two successful challenges out of many made to the methods employed in federal courts since the Knox Report.[12] [26 F.R.D. 409 at 425–426].

The headings in the 1959 Report include Racial Discrimination, Economic Discrimination, Discrimination Against Women, Political Affiliations and Geographical Distribution. The Report reviewed the Supreme Court's condemnation of racial discrimination by state courts, noting [13] that no federal court had indulged in racial discrimination since the issuance of the Knox Report. The 1959 Report also emphasized prohibitions against political or religious discrimination in any form.

---

11. In the 1959 Conference Report the footnote number is "8" and reads: "Knox Report, p. 13."

12. In the 1959 Conference Report the footnote number is "9". The footnote lists numerous cases including many of the cases cited in this opinion.

13. 26 F.R.D. 409 at 427.

In 1942, the Knox Report [14] discussed geographical distribution:

> The problem of geographical representation, the Committee believes, is one for the unfettered discretion of each court. A number of considerations should be borne in mind in the exercise of this discretion. There is no statutory provision requiring proportional representation from the several parts of the district and the convenience of both the court and juryman is served when the factor of nearness of the juror's residence to the seat of the court is given due consideration. It is evident that the nearer the juror's residence to the place of holding court, the less will be the expense to the Government in mileage and subsistence. On the other hand, possibilities of prejudice in some few cases are removed if jurors are called from scattered localities, though most Federal crimes are of such a nature that local prejudice is not usually present even in the locality where the crime was commited * * *.

In 1959, the Conference Report had the following to say in this connection:

> The problem of geographical distribution of jurors involves balancing the desirability of avoiding local prejudice with the desirability of preventing excessive expenditures of time and money by jurors and the government. It appears that the problem today is handled substantially in the same way it was in 1942. Despite complaints about excessive expenses in particular districts, no more feasible method of dealing with the problem is suggested than the continuance of discretion in local hands. It is one that probably cannot be handled in the abstract, but only in the light of particular situations. * * * [26 F.R.D. 409 at 433].

At a later point [15] in the 1959 Report, the Committee stated that the names of qualified jurors "are to be selected from such parts of the district as the court directs 'so as to be most favorable to an impartial trial and not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service,'" quoting from 28 U.S.C. § 1865(a). The Report warns that

> * * * care needs to be taken not to put in the box at the same time a disproportionate number of prospective jurors from a single section of the city or a single precinct or election district to prevent the box from containing an overly large proportion of a particular economic social or ethnic group. * * *
>
> * * * * * *
>
> In some [federal] districts, a geographical representation of jurors according to population is desired by the court, but this is not required by law. * * * [26 F.R.D. 409 at 470].

With regard to economic discrimination, the Report (at pp. 429–430) quoted from Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984, 90 L.Ed. 1181 (1946), and concluded:

> It is not known that any districts are now engaging in the same practice as was held bad in the Thiel case. Care should be taken to see that such a practice does not develop, even inadvertently, through the use of sources of names which are too limited in scope. Even the use of telephone directories may be questionable, if used exclusively as a means for securing names. * * *

Turning to discrimination against Women, the Report (26 F.R.D. at p. 431) cited Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261, 91 L.Ed. 181 (1946), and stated:

> * * * It is recommended that any district courts sitting in states which do not permit women to serve on juries should re-examine their sources of names, to be sure that they are broad enough to secure a reasonable proportion of women.

The issue of women on juries was before the Supreme Court in Glasser v.

---

14. At p. 30.

15. 26 F.R.D. 409 at 469.

United States, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942). In the *Glasser* case defendants filed motions for new trials, accompanied by their affidavits

> that all the names of women placed in the box from which the panel was drawn were taken from a list furnished the clerk of the court by the Illinois League of Women Voters, and prepared exclusively from its membership, that the women on that list had attended "jury classes whose lecturers presented the views of the prosecution", and that women not members of the League, but otherwise qualified, were systematically excluded, by reason of which affiant "did not have a trial by a jury free from bias, prejudice, and prior instructions, and as a result thereof the jury was disqualified and this affiant's rights were prejudiced in that he was deprived of a trial by jury guaranteed to him by the laws and the Constitution of the United States of America, and particularly the Fifth and Sixth Amendments, all of which he offers to prove." [315 U.S. at 83, 84, 62 S.Ct. at 471].

The Supreme Court stated that if those facts were true, defendants were deprived of their constitutional rights, but found that petitioners had not proved their contentions as the record was "barren of any actual tender of proof" by Glasser in support of his allegations. 315 U.S. at 87, 62 S.Ct. at 472. Mr. Justice Murphy noted (at 84, 62 S.Ct. 457) that the source of the information of the defendants was stated to be in a then current article in 26 A.B.A.J. 157 (1940) entitled "Women and the Law." In the course of the discussion, the Court stated that

> the officials charged with choosing federal jurors may exercise some discretion to the end that competent jurors may be called. But they must not allow the desire for competent jurors to lead them into selections which do not comport with the concept of the jury as a cross-section of the community. Tendencies, no matter how slight, toward the selection of

jurors by any method other than a process which will insure a trial by a representative group are undermining processes weakening the institution of jury trial, and should be sturdily resisted. * * * [315 U.S. at 86, 62 S.Ct. at 472].

The ruling in Thiel v. Southern Pacific Co., supra, was authoritatively summarized in the majority opinion in Ballard v. United States, supra, decided later in the same year. Mr. Justice *Douglas*, speaking for the Court, said of the *Thiel* case:

> * * * It was a civil case which had been removed to the district court on the ground of diversity of citizenship and involved a question of the liability of a common carrier to a passenger. All persons who worked for a daily wage had been deliberately and intentionally excluded from the jury lists. We held, in the exercise of our power of supervision over the administration of justice in the federal courts, see McNabb v. United States, 318 U.S. 332, [63 S.Ct. 608, 87 L.Ed. 819] [1943] that the plaintiff's motion to strike the panel should have been granted. The gist of our ruling is contained in the following statement from the opinion in the *Thiel* case:

>> "The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. * * * This does not mean, of course, that every jury must contain representatives of *all the economic, social, religious, racial, political and geographical groups* of the community; *frequently such complete representation would be impossible.* But it does mean that prospective jurors shall be selected by court officials *without systematic and intentional exclusion of any of these groups.* Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence

is an individual rather than a group or class matter. That fact lies at the very heart of the jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury." [329 U.S. 187 at 192–193, 67 S.Ct. 262 at 263; emphasis supplied].

In the *Ballard* case, women had been excluded from federal juries in California, although they were eligible as jurors in California state courts. The Supreme Court said:

We conclude that the *purposeful and systematic exclusion* of women from the panel in this case was a departure from the scheme of jury selection which Congress adopted and that, as in the *Thiel* case, we should exercise our power of supervision over the administration of justice in the federal courts, McNabb v. United States, supra, to correct an error which permeated this proceeding. [329 U.S. 187 at 193, 67 S.Ct. at 264; emphasis supplied].

As a part of its summary (26 F.R.D. 409 at 433–434) the 1959 Report stated:

* * * It still does not seem feasible or desirable to draft detailed regulations to cover the preparation of jury lists throughout the United States, considering the great diversity of local economic and social considerations found in the several districts. It is hoped that consideration of the recommendations made herein will be helpful.

The excusing of jurors is discussed in another part of this report, but it should be noted here that the pitfalls to be avoided in the choice of sources of jurors' names discussed above, must be avoided as well in the excusing of jurors for reasons of hardship and the like. Otherwise, the standards of selection observed in the making up of

jury lists may be frustrated in a later stage of proceedings.

Defendants rely heavily upon Rabinowitz v. United States, supra, in pressing their contentions in these cases. In *Rabinowitz*, the Fifth Circuit reversed the conviction and dismissed the indictment of a civil rights worker upon a showing of substantial underrepresentation of Negroes on the federal jury list. No case decided below the Supreme Court level has, within recent decades and perhaps within the history of our country, produced more discussion than, and as many interpretations as, the four separate opinions of the eight judges who sat on *Rabinowitz*.[16]

Judge Rives, writing for himself and three other members of the Fifth Circuit, reviewed the legislative history of the federal statutes governing jury selection. He noted that in the first Judiciary Act, Congress "selected for the federal courts the qualifications and exemptions prescribed by the State in which each base line federal court sat," and that "[u]ntil 1948 that remained the federal rule." 366 F.2d 34 at 45. Judge Rives also traced the appointment by the Judicial Conference of the committee headed by Judge Knox to study the federal jury system, that committee's recommendations for uniform federal qualifications, exemptions, and disqualifications, and the statute prepared by that committee. He also discussed the 1948 Congressional amendments (and their legislative history) which adopted certain uniform standards for the selection of federal court jurors. But Judge Rives also pointed out that those amendments also included a provision pursuant to which persons incompetent to serve on the state court juries of a particular state would also be incompetent to serve on juries in a federal district court sitting in that state. Judge Rives went on to emphasize the inter-connection of the 1957 jury amendments and the en-

---

16. The opinion of Judge Rives was concurred in by three Judges. In addition, Judge Brown concurred specially; Judge Bell concurred specially in part and dissented in part, joined by Judge Gewin; and Judge Coleman concurred specially in part and dissented in part.

actment of the Civil Rights Act of 1957. At that time, the opponents of the O'Mahoney amendment to the Civil Rights Act, which called for jury trial of persons accused of judicial contempt, expressed fears "that predominantly white southern juries would prevent the enforcement of the Civil Rights Act by crippling the [federal] court's power to enforce its injunctions through contempt proceedings." 366 F.2d 34 at 48. An amendment to the federal jury selection statutes was enacted in order, as was stated by Senator Church, to "establish reasonable and uniform qualifications for jurors serving in Federal courts, eliminating the 48 different sets of qualifications which now obtain," to "place the selection of jurors entirely in the hands of the Federal courts, thus avoiding practices under State law that, in effect, may systematically exclude citizens from jury duty in Federal courts on account of race or color," and to "confer another civil right —the right to serve as a juror—on a large segment of colored citizens, who now, in practice, may be prevented from doing so." 103 Cong.Rec. 13154, quoted and discussed in *Rabinowitz*, 366 F.2d 34 at 48–49.

Judge Rives and the three judges who joined with him, held that the jury selectors in *Rabinowitz* had applied incorrect standards and had, in addition, unlawfully administered the procedures they themselves espoused.

Judge Brown concurred specially in *Rabinowitz*, and thus became the "swing man" who added his fifth vote to the votes of the three judges who adopted Judge Rives' opinion. In his concurring opinion Judge Brown commented that it was completely clear that "[n]o matter how conscientious they were, the jury selectors did not add enough names of qualified Negroes because they did not know of them." 366 F.2d 34 at 78. Judge Brown, however, noted his "weak concurrence" with Judge Rives' interpretation of the standards Congress intended to establish by its 1957 legislation. It was that part of Judge Rives' opinion which caused speculation concerning the Fifth Circuit's position as to the validity or invalidity of the "key man" system as such.

*Rabinowitz* has been interpreted on the one hand, as requiring or sounding the death-knell of the "key man" system, and on the other hand, as being limited to the factual situation present therein.[17] This debate would now appear resolved, at least for the present, by the remarks of Judge Ainsworth, on behalf of himself Judge Brown and Judge Goldberg in Mobley v. United States, 379 F.2d 768 (5th Cir. 1967). Therein, at 773, the Court wrote:

> Though we held in Rabinowitz * *, that the "key man" system of juror selection, coupled with an impermissible departure from the federal statutory scheme, produced a "poisoned" basic jury list, and that "the fruits of that list were also infected" (Id. [366 F.2d] at 60), we did not thus declare the "key man" selection system illegal as such. See Scales v. United States, 367 U.S. 203, 259, 81 S.Ct. 1469, 6 L. Ed.2d 782 (1961). We felt that the

17. For a discussion of *Rabinowitz*, see United States v. Duke, supra, n. 6, 263 F.Supp. at 835–836. In *Duke*, it is noted that in *Rabinowitz*, 366 F.2d at p. 51, n. 32, Judge Rives stated that the Court did not think the "result [in United States v. Henderson, 298 F.2d 522 (7th Cir. 1962)] opposite to ours." In *Henderson*, the Seventh Circuit, at 525, stated:

> * * * Recognition that the statute envisions "efficient" service requires rejection of a conclusion that an intelligence level equated with mere literacy was intended to be imposed as a maximum standard to be employed by

the clerk and the commissioner in the selection of persons pursuant to § 1864 whose names are to be placed in the box from which jurors are drawn.

And this view of the statute not only is in accord with its express provisions but is in harmony with the observation in Brown v. Allen, 344 U.S. 443, 474, 73 S.Ct. 397, 416, 97 L.Ed. 469 [1953] that no due process infirmity invalidates a jury source which "reasonably reflects a cross-section of the population suitable in character and intelligence for that civic duty".

facts in *Rabinowitz* warranted a holding that the jury list was improperly constituted because the jury selectors applied "wrong standards" and used "grossly inadequate sources."

■ In the cases at bar, this Court finds that there has been no departure, "impermissible" or otherwise, from the federal statutory scheme as amplified by the 1959 Conference Report; and that the jury selectors applied correct standards and used adequate sources. Therefore, this Court does not find it necessary to express any opinion concerning whether the "key man" system as prescribed by the Judicial Conference and as utilized in this Court, could or could not, when coupled with "an impermissible departure from the federal statutory scheme," produce a " 'poisoned' basic jury list" with the consequent infection of "the fruits of that list."

The Judicial Conference of the United States, at its September 1966 meeting "endorsed the random selection principle and recommended that district judges consider reevaluation of present methods of jury selection in light of recent judicial decisions." (September, 1966 Conference Report, 36 U.S.L.W. 2196 (1967)). At its September, 1967 meeting, the Conference adopted certain resolutions with regard to conversion from the "key man" selection system procedure.[18]

In essence, the statute (S. 989) referred to in the Conference resolutions[19] embraces the principles of random selection. The fact that the Congress, the Conference, and this Court, along with all other Federal District Courts, are considering changes in the jury selection system, or that certain changes with regard thereto have been made by this Court within recent months, does not in any way characterize as unlawful the procedures under which the juries involved in the cases now before this Court were chosen. The legislative changes

18. The September, 1967 Conference resolutions read as follows:

"1. That the Director of the Administrative Office of the United States Courts be directed to communicate with the Chief Judges of the United States District Courts which have heretofore utilized the 'key man' jury selection system in whole or in part, to ascertain whether such districts have since adopted a system of random selection of jurors in a manner that would produce a fair cross-section of the community in the district or division in which court is held.

"2. That in the last few months many of the districts that have employed the 'key man' system of jury selection are in the process of or have already converted to a random system of jury selection using voter lists as the basis for selecting the jury venire and it is desirable that those courts that have not already done so should convert as soon as convenient from the 'key man' system to the 'random' system,

"That it is now highly desirable that such changes including the promulgation of district plans be accomplished on a uniform basis, and on the basis of standards clearly spelled out by statute so that all will be clearly informed of the rights of litigants and prospective jurors, and,

"That passage of such provisions as those increasing the travel and subsistence of jurors as well as other administrative features of S. 989 are also necessary to the success of this transition program,

"Therefore it is the sense of the Conference that passage of S. 989 as quickly as possible after the deliberations of Congress are concluded would be of substantial benefit in producing the desired uniformity in juror selection and qualification procedures in the Federal Judiciary.

"3. That the Director of the Administrative Office be requested to provide those courts seeking to convert to a random selection system with such administrative assistance as may be required within budgetary limitations, and with such other technical assistance as may be helpful, including the furnishing of model plans, orders, and forms relating to jury selection programs.

"4. That all courts adopting a district plan, report, order, or rule in respect to jury selection be requested to send two or more copies of such document or documents to the Administrative Office of the United States Courts." (36 U.S.L.W. 2196 (1967)).

19. See supra n. 18.

being sought by Congressional supporters of the random selection principle and detractors of the "key man" system are based upon their conviction of the need to change or at least amend existing law. Thus, in the second paragraph of his article in the American Bar Association Journal, 53 A.B.A.J. at p. 129, Senator Hart wrote:

The fundamental defect *in the present laws* relating to the selection of federal juries—contained in Chapter 121 of the Judicial Code—is that they do not afford sufficient guidance to federal jury commissioners as to how they should discharge the duties imposed upon them by the Constitution. [Emphasis supplied].

In United States v. Duke, 263 F.Supp. 828 (S.D.Ind.1967), Chief Judge Steckler, after quoting the 1959 Judicial Conference Report's espousal of the key-man system, concluded (at 837):

\* \* \* [T]he Court does not say that the system is perfect or even near-perfect or that a better system might not be devised. Advances in the fields of sociology, demography and other technologies might well make it feasible to have a completely random system of juror selection while the ever-increasing work load of this Court and the concomitant need for a greater and greater number of jurors together with the gradual alienation of individuals and the decreasing number of persons acquainted with a cross-section of the community which may well be resulting from the constantly increased mechanization of our civilization might well render the juror-suggestor system impractical in the future. The Court recently has recommended that the Jury Commissioners consider some possible changes in the system of juror selection, but this recommendation results not from past or present circumstances, but from what the future is likely to bring. \* \* \*

The system under attack in *Duke*, like the one challenged in these cases, was closely attuned to the 1959 Conference Report. The issues raised in *Duke* in-cluded the alleged full or partial exclusion of Negroes, *young adults*, persons with low incomes, women, political groups, geographic groups and religious groups. With respect to these groups, the Court commented (at 831):

\* \* \* [I]t appears that a jury selection system must be subjected to scrutiny on more than one level and that proof that the jurors actually selected constitute a substantial cross-section of the community will not suffice to establish the legality of the system. It also must appear that the system is calculated in its design to produce a juror list which constitutes a cross section of the community and that where jurors are recommended instead of drawn at random, it must appear that the suggestors as a whole are acquainted with a cross section of the community. Thus the Court must consider the evidence as it reflects upon each allegedly excluded group with respect to each of the three above-recited criteria.

Judge Steckler found either no evidence or insufficient evidence of substantial under-representation of any of the groups, even though the jury list did not reflect statistical cross-sections.

In United States v. Hunt, 265 F.Supp. 178, at 181–185 (W.D.Tex.1967), the Court reviewed at some length the work of the Jury Committee of the Judicial Conference of the United States since 1941, and, after noting the reliance in the 1959 Conference Report upon the *Thiel* decision, commented (at 185):

It is apparent that the Jury Committee was of the view that its recommendations and suggestions would make for the attaining of the goals set by the United States Supreme Court in the quotation.

The Judicial Conference and its committee play a very important part in the administration of federal courts. Obviously neither the actions of the Judicial Conference nor any of its committees can prevail over the decisions of the authoritative federal appellate courts. It is to be noted that the Jury

Committee is still functioning * * * or as one member stated, "struggling" with the problem of jury selection. * * * It is apparent that the selection of federal court jurors, especially in metropolitan areas, presents a serious and difficult problem to which there is no simple and apt solution.[20]

Contentions have been advanced in this case that the use of more random methods in connection with selections for jury service for the September 1967 term proves, or at least indicates that unlawful practices existed prior to those changes. To the contrary, this Court believes that the adoption of new or amended jury selection procedures, like improvements in other legal and non-legal fields and situations, does not *per se* prove that prior practices were wrong, or with regard to a legal issue, unlawful. Certainly, the Judicial Conference has in no way indicated that its recent suggestions that *federal district courts move away from the "key man" approach and toward random selection* renders unlawful and contrary to statute past practices which were in accordance with the Conference's prescriptions.

█ This Court finds that its jury selectors have followed the procedures and applied the standards required by the Constitution, the Congressional mandates set forth in Chapter 121 of Title 18 of the United States Code, and the recommendations of the Conference. This Court also finds that lawful sources were used and that no intentional or negligent discrimination or imbalance existed in connection with the selection or compilation of the juries here under attack. This is not to say that the system in this Court has been, or is today, perfect. But this Court finds deficient the challenges

herein which are based upon *Rabinowitz* and on the proposals in Senator Hart's article (53 A.B.A.J. 129). *Rabinowitz*, as we have seen, does not outlaw the "key man" system as such; and Senator Hart's advocacy is directed toward changes in jury selection procedures.

II.

█ The challenges here to the application by this Court of the procedures and standards it has been following require detailed analysis. There is no evidence in any of the cases at bar that any of the defendants was in any way prejudiced by any of the alleged jury imbalances. However, as Judge Learned Hand stated in United States v. Dennis, 183 F.2d 201, 216 (2d Cir. 1950) aff'd 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), a Smith Act case:

> * * * [W]e will assume that any party to a suit, civil or criminal, is entitled to have the particular panel which tries his case, drawn at random from a list which is not unlawfully weighted, and that he may complain even though he has not shown that the imbalance has prejudiced him. The question therefore becomes whether the grand panel and the petit panel which respectively found the indictment and tried the case, were drawn from an unlawful list.

This, wrote Judge Hand (at 216) was true even though the individual jury " * * * taken by itself * * * was unexceptionable."

█ The defendants do not contend in the cases before this Court that the Jury Commissioner intentionally excluded in whole or in part any identifiable group. But they do take the position that the percentage variations in connection with

**20.** Voting lists themselves do not necessarily guarantee a jury list constituting a statistical cross-section of the community. It has been noted that "some cognizable groups fail to register to vote." Dow v. Carnegie-Illinois Steel Corporation, supra, n. 8, 224 F.2d at 427. See also United States v. Flynn, 216 F.2d 354, 385–386 (2nd Cir. 1954), an opinion in a Smith Act case by Mr. Justice Harlan, then a Circuit Judge, and the views of Senator Erwin expressed in "Jury Reform Needs More Thought," 53 A.B.A.J. 132 (1967), a companion article to that of Senator Hart, in which Senator Erwin took a position, which if not contrary to, was certainly not wholly in accord with, the approach of Senator Hart.

certain identifiable groups between the eligible juror population of the District and the jury lists of those actually called for jury service add up to unlawful discrimination. The burden of proof with regard to any such alleged discriminatory variation is upon the defendants in these cases. They have the burden of proving purposeful or neglectful exclusion of an identifiable group. See Whitus v. State of Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); Swain v. State of Alabama, 380 U.S. 202, 208, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965); Mobley v. United States, supra, 379 F.2d at 771; Labat v. Bennett, 365 F.2d 698, 712 (5th Cir. 1966) one of the *Rabinowitz* cases. In *Mobley*, 379 F.2d at 771, the Fifth Circuit stated that "juries must be drawn from a fair cross section of the community." Cited in support are Ballard v. United States, supra; Thiel v. United States, supra; Smith v. State of Texas, 311 U.S. 128, 61 S.Ct. 164, 85 L.Ed. 84 (1940); Scott v. Walker, 358 F.2d 561, 564 (5th Cir. 1966). In *Rabinowitz*, 366 F.2d at 45, the Fifth Circuit earlier wrote that juries must be "drawn from a pool of persons broadly representative of the community."

As noted, it is conceded that not only were there no imbalances in the jury selection process here under attack with regard to race, religion or political affiliation, but also that there were almost perfect balances in those categories.

■ With respect to sex, the evidence shows that the percentage of women drawn for jury service was about 33%, whereas the number of women in the community slightly exceeds the number of men. There is no evidence whatsoever of any conscious discrimination, and, no doubt, many women who would otherwise have been suggested by "key men" were not suggested because they had home responsibilities of caring for children or older people, which would have resulted in them being excused if called.

Experience over the years has shown that there have almost always been women on the jury panels finally selected. In particular, we note the existence of substantial representation of women on the jury lists and on the grand and petit juries under attack here, and the lack of any discrimination or imbalance violative of the rules set out in the applicable Supreme Court cases or in the Judicial Conference standards.

■■ With respect to age, the evidence shows that the percentage of persons between the ages of 21 and 30 and 30 and 40 drawn for jury service has been substantially below the percentage of persons of those ages in the community. On the other hand, if the breakdown according to age is made on the basis of 21 to 44 and 45 and over, the evidence then shows that there has been no substantial discrepancy. Classification of persons on a decennial age basis may well be significant for certain purposes, but it is certainly not required as an underlying jury selector principle. Further, a substantial number of persons under the age of 30 and between the ages of 30 and 40 has always been included on the jury lists of this Court. It is also fair to comment that it is a matter of common knowledge, and the evidence shows, that many women in the younger age groups have responsibilities of care for young children, and that many persons of both sexes in the younger age categories are away from home at school, and in the case of men, in military service.

■ Defendants have produced evidence to show that 15% of the eligible population for jury service is represented by a group which includes managers, officials and proprietors. The evidence also shows that 34.5% of the persons selected for grand jury service fall within this group. Patently, the representation of non-members of this occupational group is far more than token and indeed substantial.

■ Turning to the educational category, the evidence shows that slightly more than 50% of that part of Maryland's population which is over 21 years of age, and which includes persons with at least a sixth grade education, has less than a high school diploma. Approximately 24% of those drawn for grand

jury service and about 33% of those drawn for petit jury service come from this group. Again, the representation of those without a high school diploma is substantial.

With regard to geographical distribution, the evidence shows that the population of Maryland lives principally in two areas: in Baltimore and its adjacent counties, and in the Montgomery and Prince George's Counties adjacent to the District of Columbia. The census figures reveal a gigantic growth in recent years in those latter two counties. More than 23% of Maryland's over-21 years of age population reside in them. Only 1.6% of those selected for grand jury service in the period under challenge came from them.

■ Pursuant to 28 U.S.C. § 1865 (a), this Court is empowered to select grand and petit jurors from such parts of the District as the Court directs so as *"not to incur unnecessary expense or unduly burden the citizens of any part of the district with jury service."* (Emphasis supplied). Judge Watkins testified in these proceedings that the Court finds it "very convenient" and that the Clerk finds it time-saving for all concerned, including the potential jurors, if the Clerk's Office can call on the phone at five o'clock and tell petit jurors living in or near Baltimore to report the next day. Further, it is well-known to the bar of this Court, including all of defense counsel who participated in this case, that the five judges of this Court, aided by the Clerk's office, have made and continue to make every effort not to have jurors sitting idly in our Courthouse when they are not needed, and at the same time to have sufficient "back-up" jury cases ready to be tried if a previously scheduled case takes less time to try than anticipated.

Section 100 of 28 U.S.C. requires that this Court sit in Cumberland, in Western Maryland, and in Denton, on the Eastern Shore, subject to certain conditions. Occasionally, requests that cases be heard in Western Maryland or on the Eastern Shore have been received and honored.

Also, in recent years this Court has instructed the Clerk to include in the jury box the names of a sufficient number of persons from the Eastern Shore and from Western Maryland, so that a person from either of those areas who asks for trial in his area or who asks for a State-wide jury, will have a State-wide jury panel, upon which the proportion of veniremen from the region involved will be at least equal to the percentage which the population on the Eastern Shore, or of the four Western Maryland Counties, as the case may be, bears to the total population of the State. No request for trial of any particular case in Prince George's County or Montgomery County, or for the provision of a State-wide jury panel in a case involving a party from one of those counties, has been received by this Court in the experience of any of the five Judges now sitting.

Undoubtedly, the percentage of jurors from Montgomery, Prince George's and the Southern Maryland Counties has been lower than the percentage from other portions of the State, but this result has obtained because the Judges of the Court, as well as the Clerk and the Jury Commissioner, have understood that it is not improper to draw a jury from the general area in which the Court is held, in order to reduce the inconvenience to jurors and unnecessary expenses.

The contention has also been made that jurors have been drawn over-proportionately from certain postal zones in the metropolitan areas of Baltimore and underproportionately from certain others. It is argued that this has resulted in or contributed to alleged educational and economic imbalances within certain community groups. The relationship of the percentages in connection with one or more identifiable groups upon the percentages of one or more other such groups produces much food for speculation. For example, the inclusion of what is alleged to be an undue number of the residents of certain areas within Baltimore City may well have contributed to the correct proportions with regard to race, religion and political affiliation. Further, with

regard to the alleged slighting of Montgomery and Prince George's Counties, these counties are well-known as "bedroom" counties for government officials and employees stationed in Washington, D. C. Official statistics reflect the existence of very high educational and economic levels in those two counties. Thus, the under-proportionate geographic representation from these counties may well alleviate rather than aggravate such District-wide educational and economic differentials, if any, as may exist.

In United States v. Dennis, supra, 183 F.2d at 218, defendants alleged that a large disproportion of jurors came from the wealthier districts of the City. Judge Learned Hand, in affirming the convictions below, commented (at 224):

> It is perhaps in order to say a word about the phrase itself—"cross-section,"—because the defendants so much rely upon it. It means a fair sample; * * *. The clerks attempted to apply these standards roughly by territorial discrimination, to which the defendants object that even though used in good faith, it resulted in weighting the list with the wealthy. There cannot of course be any doubt that the resulting sample is different from what it would have been, had the clerk sent out notices to all districts, based on their population, thus abandoning any effort to make any selection in advance. Moreover, we shall accept it as true, as it probably is, that the distribution of wealth in such a list would have been markedly different from the list actually made. There is nothing wrong in the method as such, unless the law insists that all exclusions must represent the same proportionate distribution of wealth that would exist without them * * *.

◼ The Supreme Court stated, in Swain v. State of Alabama, supra, 380 U.S. at 208, 85 S.Ct. at 829:

> * * * Neither the jury roll nor the venire need be a perfect[21] mirror of the community or accurately reflect the proportionate strength of every identifiable group.

However, unexplained differences between the proportion of an identifiable group on a jury list of this District and in the total eligible population of this District must be examined to determine if such differences furnish any evidence of systematic exclusion by intentional or neglectful actions or non-actions by the Jury Commissioner or by this Court.

The Supreme Court also wrote, in Swain v. State of Alabama, at 208–209, 85 S.Ct. at 829:

> * * * We cannot say that purposeful discrimination based on race alone is satisfactorily proved by showing that an identifiable group in a community is underrepresented by as much as 10%. * * * Undoubtedly the selection of prospective jurors was somewhat haphazard and little effort was made to ensure that all groups in the community were fully represented. But an imperfect system is not equivalent to purposeful discrimination based on race. * * *

In the cases at bar, the system was clearly not haphazard. It was set in the pattern of the recommended procedures of the Judicial Conference. While defendants have shown certain imbalances, defendants have not proved any systematic exclusion or any intentional or negligent discrimination on the part of

21. Cases in which specific comments have been made that the jury selection system is not required or expected to provide statistical perfection include: Mobley v. United States, 379 F.2d 768, 772 (5th Cir. 1967); Chestnut v. People of State of New York, 370 F.2d 1, 6–7, n. 13 (2d Cir. 1960); Rabinowitz v. United States, 366 F.2d 34, 59 (5th Cir. 1966); Chance, v. United States, 322 F.2d 201, 204, 205 (5th Cir. 1963); Gorin v. United States, 313 F.2d 641, 644 (1st Cir. 1963); United States v. Henderson, 298 F.2d 522, 525 (7th Cir. 1962); United States v. Flynn, 216 F.2d 354, 378, 388 (2d Cir. 1954); United States v. Dennis, 183 F. 2d 201, 224 (2d Cir. 1950); United States v. Hunt, 265 F.Supp. 178, 187, 190–191 (W.D.Tex.1967); United States v. Duke, 263 F.Supp. 828, 831, 834 (S.D.Ind.1967).

the Clerk or of the Jury Commissioner, in whole or in part. The Clerk and his staff, and the Jury Commissioner of this Court, and as far as this Court knows, their counterparts in other Federal District Courts, do not hold graduate degrees in statistics or sociology. Neither are the Clerks' offices in our District Courts equipped with computers and the personnel to operate them. To expect, under the jury selection system prescribed by the 1959 Conference Report, that the percentage of *each* identifiable group in our population will be substantially the same on a jury list of a district as within the population of that district would not be reasonable. The near-perfect fit of the proportions in the jury lists under examination in these cases with regard to race, and with regard to religious and political affiliations, is in itself a dash of good luck added to a brew which included careful adherence to the procedures prescribed by the 1959 Conference Report, * * * awareness [22] of the necessity to avoid discrimination, and employment of that awareness in the selection of the jury lists.

 The presence of a token number of the members of an identifiable group on a jury list would raise a legitimate question as to whether there existed, either because of intent or neglect, a pattern of inadequate inclusion of members of that group. But the inclusion of exact proportionate representation of every group is not required. See Labat

v. Bennett, 365 F.2d 698, 712 (5th Cir. 1966). Here each group is substantially represented and the percentage variations which exist with regard to certain of the groups have been satisfactorily explained.

We are asked, in effect, to compare and contrast percentage variations in connection with each identifiable group within the community, and to conclude that the juries in these cases were not in fact, (using the words of *Rabinowitz*, 366 F.2d at 45) "drawn from a pool of persons broadly representative of the community" because the jury lists and the juries do not mirror the community with exact statistical perfection. To so conclude would be to fly in the face of the principles of decided case law. We have found no case, pertaining to state juries and decided solely on a constitutional issue basis, or pertaining to federal juries and decided in the light of the federal court system's more exacting supervisory responsibilities, in which a federal court, from the vantage point of twenty-twenty hindsight, has decided that a jury selection system has been negligently and therefore unlawfully administered because such administration, while achieving substantial representation within all of the identifiable community groups discussed in the 1959 Conference Report, has also produced partial deviation from complete statistical balance within a few of those group categories.[23] This Court will seek, as it has in the past, to achieve

22. For references to the need of awareness of the composition of the community, see Brooks v. Beto, 366 F.2d 1, 23 (5th Cir. 1966); Clark v. Allgood, 258 F. Supp. 773, 776 (E.D.La.1966).

23. The Court has considered, *inter alia*, the following cases in which there is mention of race, religion, political affiliation, education, age, sex, geography and occupation:
*Race:* Swain v. State of Alabama, 380 U.S. 202, 85 S.Ct. 824; Witcher v. Peyton, 382 F.2d 707 (4th Cir., September 1, 1967); Mobley v. United States, 379 F.2d 768; Pope v. United States, 372 F.2d 710 at 722; Rabinowitz v. United States, 366 F.2d 34; Dow v. Carnegie-Illinois Steel Corp., 224 F.2d 414 at 425;

United States v. Flynn, 216 F.2d 354 at 378 et seq.; United States v. Dennis, 183 F.2d 201 at 223; United States v. Hunt, 265 F.Supp. 178; United States v. Duke, 263 F.Supp. 828 at 832; Clark v. Allgood, D.C., 258 F.Supp. 773;
*Religion:* United States v. Duke, supra, 263 F.Supp. at 834;
*Political Affiliation:* Gorin v. United States, 313 F.2d 641 at 645; United States v. Duke, supra, 263 F.Supp. at 830–834; United States v. Frankfeld, 101 F.Supp. 449 (D.Md.1952);
*Education:* Rabinowitz v. United States, supra; United States v. Henderson, 298 F.2d 522 at 525;
*Age:* Pope v. United States, supra, 372 F.2d at 723; King v. United States,

within its jury system, full representation of the community with regard to all such groups. In so doing, efforts directed toward improvements will be made. The recognition that such efforts are apposite in no way requires the conclusion that intentional or negligent discrimination occurred, or that substantial lack of representation of any identifiable group existed, in connection with the juries under attack in these cases.

The motions are hereby denied.

346 F.2d 123, 124 (1st Cir. 1965); United States v. Duke, supra, 263 F.Supp. at 830–832;

*Sex:* Ballard v. United States, 329 U.S. 187, 67 S.Ct. 261; Glasser v. United States, 315 U.S. 60, 62 S.Ct. 457; Chance v. United States, 322 F.2d 201 at 204; King v. United States, 165 F.2d 408 (8th Cir. 1948); United States v. Duke, supra, 263 F.Supp. at 834;

*Geography:* King v. United States, supra, 346 F.2d 123 at 124; Chance v. United States, supra, 322 F.2d at 205; Katz v. United States, 321 F.2d 7, 9 (1st Cir. 1963); United States v. Flynn, supra, 216 F.2d at 380, 385; United States

v. Dennis, supra, 183 F.2d at 216, 221; In re Petition for Special Grand Jury, 50 F.2d 973 (M.D.Pa.1931); United States v. Duke, supra, 263 F.Supp. at 830–834; United States v. Frankfeld, supra, 101 F. Supp. at 451, 453;

*Occupation:* Thiel v. Southern Pacific Co., 328 U.S. 217, 66 S.Ct. 984 (1946); Chance v. United States, supra, 322 F.2d at 204–205; Dow v. Carnegie-Illinois Steel Corp., supra, 224 F.2d at 425; United States v. Flynn, supra, 216 F.2d at 381; United States v. Dennis, supra, 183 F.2d at 216, 221; United States v. Frankfeld, supra, 101 F.Supp. at 450 et seq.