**Earl CLARK**

v.

**J. Wayne ALLGOOD, Warden, Louisiana State Penitentiary.**

**Misc. No. 847.**

United States District Court
E. D. Louisiana,
Baton Rouge Division.

Sept. 23, 1966.

John P. Dowling, Victor P. LeBeau, New Orleans, La., for petitioner.

Jack P. F. Gremillion, Atty. Gen. of Louisiana, Teddy W. Airhart, Jr., Asst.

Atty. Gen., David French, Sp. Counsel, Baton Rouge, La., Leander H. Perez, Jr., Dist. Atty., Eugene Leon, Jr., Asst. Dist. Atty., 25th Judicial District, Pointe-a-La-Hache, La., for respondent.

WEST, District Judge:

Petitioner, Earl Clark, seeks a writ of habeas corpus. He is presently confined at Louisiana State Penitentiary at Angola, Louisiana, awaiting execution of the death sentence, having been convicted in May of 1961 of the crime of aggravated rape. He urges several grounds for the issuance of the writ, including (1) that the District Attorney improperly referred to a confession in his opening statement to the jury, but that no confession was ever offered in evidence; (2) that he was denied a transcript of the State Court proceedings which he contends was necessary for a successful appeal; (3) that the sentence of death for the crime of aggravated rape as provided for by Louisiana law is a cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution; and (4) that there was a systematic exclusion by virtue of a systematic inclusion of a token number of Negroes on the grand jury by which he was indicted.

In view of the recent decision of the Fifth Circuit Court of Appeals in the case of Brooks v. Beto, 366 F.2d 1 (CA 5, 1966), there is need only to consider the last referred to grounds relied on by petitioner, i. e., that there was a systematic exclusion of Negroes by virtue of a systematic inclusion of a token number of Negroes on the grand jury which indicted petitioner.

A full evidentiary hearing was held before this Court and from the evidence there adduced, it must be concluded that the grand jury which indicted petitioner in July of 1960 did not meet the requirements set forth by the Fifth Circuit Court of Appeals in Brooks v. Beto, supra. Under the Louisiana statutes in effect at the time of petitioner's indictment, the jury commissioners of Plaque-

mines Parish were charged with the duty of compiling a general venire list of 300 persons, from which list both grand and petit juries finally came. The names of persons placed on this general venire of 300 were obtained by the commissioners by use of voting lists, telephone books, personal acquaintances, etc. After this list was compiled, the names of 20 persons were selected (not drawn) therefrom by the jury commission to constitute the grand jury venire list. This list was presented to the presiding judge, who selected one person therefrom to act as foreman of the grand jury. The remaining 19 names were then placed in a box, and 11 names were then supposed to be drawn therefrom by lot to make up, together with the foreman selected by the judge, the grand jury of 12 people.

The evidence presented in this case clearly shows that in selecting the 20 names to make up the grand jury venire, the commissioners intentionally placed a limited number of Negroes' names thereon in order that Negroes would not be entirely excluded from the venire list. For example, as testified to by Mr. Anthony Protti, Sr., a jury commissioner:

"Q. You saw to it that you had one or two Negroes and you saw that the rest of them were white?

"A. Yes, sir.

"Q. Is that right?

"A. Yes, sir."

And Mr. Bertrand L. Foch, another jury commissioner, testified:

"Q. Because of the disproportion of population, Plaquemines Parish has primarily a white population, has it not?

"A. There are more whites than Negroes in Plaquemines, yes.

"Q. Would you say its about four or five to one? Four whites to about one Negro in population?

"A. Five to one, maybe its five to one, it could be.

"Q. So, the Jury Commission, I presume, felt that the grand jury venire should reflect the proportion of about four or five to one on the grand jury venire list, is that about right, provided they had the qualifications?

"A. That's right."

The evidence further shows that on 14 consecutive grand jury venire lists from 1955 through 1961, the list of 20 names contained the names of 2 Negroes each. Of the remaining 6 grand jury lists, selected between 1951 and 1955, 4 of them contained the names of 3 Negroes and 2 contained the names of 2 Negroes. Thus, of the 20 grand jury venire lists selected by the jury commission in Plaquemines Parish between 1951 and 1961, 16 of them contained the names of only 2 Negroes, and 4 contained the names of 3 Negroes.

After the selection by the jury commission of the 20 names to make up the grand jury venire, the names of 11 jurors were then supposed to be drawn, by lot, from the 19 names placed in the box. It is the contention of the jury commissioners who testified here that since there were Negroes represented on the grand jury venire of 20, and since the 11 names were then drawn by lot from that list, there could be no systematic exclusion or inclusion as far as the final selection of the grand jury is concerned. It is, however, noted that each of the cards containing the names of the 20 persons making up the grand jury venire, which cards were placed in the box, did, in fact, contain a notation as to the race of the person named. But the jury commissioners deny that any consideration was given to race or color in the final selection of the grand jury from the list of 20. While this argument may seem valid on its face, the proven facts do not attest to its validity. The evidence shows that a new grand jury was drawn every six months in Plaquemines Parish. Thus, in the ten year period prior to petitioner's conviction, from 1951 to 1961, there was 20 grand juries empanelled. The evidence shows that of these 20 grand juries, 19 of them, as finally empanelled, contained the name of *one* Ne-

gro, and one contained the names of *two* Negroes. It would be taxing this Court's credulity to ask it to believe that such a uniform inclusion of one Negro on each of 19 grand juries over a period of ten years was the result of chance drawing by lot from an integrated list of 19 names. As stated by Mr. Justice Frankfurter in his concurring opinion in Cassell v. State of Texas, 339 U.S. 282 at 293, 70 S.Ct. 629 at 634, 94 L.Ed. 839 at 850:

"If one factor is uniform in a continuing series of events that are brought to pass through human intervention, the law would have the blindness of indifference rather than the blindness of impartiality not to attribute the uniform factor to man's purpose."

According to Dr. Arnold Levine, Professor of Mathematics at Tulane University, given the grand jury venire lists as they appeared in Plaquemines Parish between the years 1951 and 1961, and as hereinbefore described, the chance of the twenty grand juries empanelled between those years being composed as set out above, if drawn by lot, would be less than one in 10,000. As stated in Brooks v. Beto, supra:

" * * * the Courts have consistently held that statistics speak louder than jury commissioners."

■ When the statistics show what appears to be a uniform, systematic inclusion of a token number or of a uniform number of Negroes on a jury panel, a prima facie case of discrimination is established. It is then up to the State to rebut the presumption by showing that the system used was fairly calculated to produce a cross section of the community, and that the lack of a cross section on a particular list or panel just happened to be the fortuitous result of chance. Brooks v. Beto, supra, footnote 40. The statistics in the present case present a strong prima facie case of systematic inclusion of a token number of Negroes on the grand juries of Plaquemines Parish during the years 1951 through 1961. The State has completely failed to rebut this presumption. That race of prospective jurors may, and indeed must be taken into consideration in making a jury venire list has now been clearly established by the holding in *Brooks*. But as stated therein:

"The dual requirements making awareness of race inevitable must be met, but this must never, simply never, be done as the means of discrimination. *It must never, simply never, be applied to secure proportional representation. It must never, simply never, be applied to secure a predetermined or fixed limitation.*" (Emphasis added.)

■ As stated by Mr. Justice Vinson in Avery v. State of Georgia, 345 U.S. 559 at 561, 73 S.Ct. 891 at 892, 93 L.Ed. 1244 at 1247:

"The Jury Commissioners, and the other officials responsible for the selection of this panel, were under a constitutional duty to follow a procedure —'a course of conduct'—which would not 'operate to discriminate in the selection of jurors on racial grounds.' Hill v. State of Texas, 1942, 316 U.S. 400, 404 [62 S.Ct. 1159, 86 L.Ed. 1559]. If they failed in that duty, then this conviction must be reversed —no matter how strong the evidence of petitioner's guilt. That is the law established by decisions of this Court spanning more than seventy years of interpretation of the meaning of 'equal protection.' "

■ Thus, it being concluded that the grand jury by which petitioner was indicted was not drawn or empanelled in accordance with the requirements of due process and equal protection of the laws as required by Brooks v. Beto, supra, this Court has no alternative but to grant the writ of habeas corpus prayed for, reserving, however, to the State of Louisiana the right to re-indict and re-try petitioner, within a reasonable time, if it wishes to do so in accordance with law.