RILEY BROOKS *v.* STATE OF
MARYLAND

[No. 191, Initial Term, 1967.]

Decided April 3, 1968.

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and MELVIN, J., Associate Judge of the Fifth Judicial Circuit, specially assigned.

*Jerome F. Connell, Sr.,* for appellant.

*Alfred J. O'Ferrall, III, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* and *Marvin H. Anderson, Assistant State's Attorney for Anne Arundel County,* on the brief, for appellee.

ANDERSON, J., delivered the opinion of the Court.

On January 17, 1966, the appellant, Riley Brooks, was convicted by a jury of murder in the first degree, without capital punishment, in the Circuit Court for Anne Arundel County, Judge Matthew S. Evans presiding. Appellant was sentenced to life imprisonment.

Appellant raises two contentions on appeal:

1. That the jury by which the appellant was convicted was not drawn or impaneled in accordance with the requirements of due process and equal protection of the law.
2. That the lower court erred in refusing to grant the Defendant's Motion for a Judgment of Acquittal of murder in the first degree.

The evidence adduced at the trial established that one Idus Wimberly was shot several times by the appellant, Riley Brooks, and died as a direct result thereof. There were two divergent explanations of the occurrence. The deceased's widow, Myrtle Wimberly, testified that after an altercation, arising out of the deceased's remarks to the appellant, reminding appellant that he and Coretha Thomas were not married, and the deceased's ordering of the appellant from the deceased's house, while threatening him with a raised chair, the appellant drew a gun

and shot the deceased several times. Appellant's version was that after Mrs. Wimberly had left the room, the deceased ordered him from the house and produced a pearl handled gun which appellant successfully wrested from him only to be confronted by another gun which the deceased then withdrew from under his mattress, which allegedly was the same gun used earlier in the day by the deceased to shoot at one Dreece Green, thus compelling the appellant to begin firing at the deceased in self-defense. Appellant further testified that as he fled from the deceased's residence shots were fired at him. Appellant testified that he disposed of his weapon somewhere along Fort Meade Road.

The record before us indicates that on July 5, 1965, a picnic was held at the home of Idus and Myrtle Wimberly, on Elkridge Landing Road, Anne Arundel County, Maryland. Riley Brooks, Coretha Annette Thomas, Mrs. Wimberly's niece, and her six children arrived at the Wimberly residence. Also present were Dreece Roberta Green, William H. Boone, Joe McKen, Beulah McKen, Mr. and Mrs. George M. Davis and their five children. Later, Idus Wimberly, William H. Boone and George M. Davis drove to the Elkridge Liquor Store, where Idus Wimberly purchased two fifths of whiskey and they returned to the picnic. After everyone ate, Idus Wimberly and some of the children were outside, when the children began teasing him, calling him "Mr. Wimpy," causing him to become very upset. This incident precipitated an altercation between Idus Wimberly and George Davis. Subsequent thereto, Idus Wimberly appeared to have calmed down and entered the house expressing his intention to lie down. Shortly thereafter, he emerged firing a gun and ordered everyone off his property. He then sought out George Davis and later fired at Dreece Green.

Following the shooting, everyone with the exception of Joe McKen, Beulah McKen and Mr. and Mrs. Wimberly went to the home of Riley Brooks, the appellant. Appellant then telephoned the Wimberly residence, talked with Mrs. Wimberly and then returned to the Wimberly place. He entered into a conversation with the Wimberlys culminating in an altercation and the subsequent shooting and death of Idus Wimberly.

## I

Appellant's contention that there was an extreme variation between the number of Negro and white jurors, thus raising the presumption of discrimination against the Negro race in the selection of the jury and the consequential violation of the constitutional rights of the appellant, is predicated upon the premise that once this issue is raised, a prima facie case is established and the State assumes the burden of establishing that the selection system used was fairly calculated to produce a true cross section of the community.

In support of this contention, appellant relies entirely upon the cases of *Clark v. Allgood,* 258 F. Supp. 773 (1966) and *Whitus v. Georgia,* 385 U. S. 545, 87 S. Ct. 643, 17 L. Ed. 2d 599 (1967).

In *Clark v. Allgood, supra,* at page 776, the District Court, relying upon the Fifth Circuit Court of Appeals' decision in *Brooks v. Beto,* 366 F. 2d 1 (CA 5, 1966), stated:

"When the statistics show what appears to be a uniform, systematic inclusion of a token number or of a uniform number of Negroes on a jury panel, a prima facie case of discrimination is established. It is then up to the State to rebut the presumption by showing that the system used was fairly calculated to produce a cross section of the community, and that the lack of a cross section on a particular list or panel just happened to be the fortuitous result of chance."

However, the statistics upon which that Court based its findings in *Clark* consisted of evidence that from 1951 until 1961, a time span encompassing the ten years prior to the petitioner's conviction, twenty consecutive grand juries had been impaneled and of those, nineteen of them, as finally impaneled, contained the name of one Negro, and one contained the names of two Negroes. It was also noted that the happenstance of mere chance, producing that outcome if the above had been drawn by lot, "would be less than one in ten thousand." The evidence presented clearly showed that "the commissioners intentionally placed a limited number of Negroes' names thereon in order that the Negroes would not be entirely excluded from the venire list."

In *Whitus v. Georgia, supra,* the Supreme Court found sufficient proof that Georgia had employed the same procedures which had concededly resulted in discrimination in the first trial of the petitioners and thus "constituted a prima facie case of purposeful discrimination" in the selection of the grand and petit juries involved in the second trial of the petitioners.

The Supreme Court noted at page 550 that:

> "The burden is, of course, on the petitioners to prove the existence of purposeful discrimination, *Tarrance v. Florida,* 188 U. S. 519 (1903). However, once a prima facie case is made out the burden shifts to the prosecution."

The proof relied upon by the Supreme Court in *Whitus* developed from the following facts at pages 550-551:

> "It is undisputed that the 'revised' jury list was made up from the 1964 tax digest, the old jury list and the personal acquaintance of the commissioners with persons in their respective communities. It is admitted that the old jury list had been condemned as illegal by the Court of Appeals when it reversed petitioners' first convictions. It is conceded that 27.1% of the taxpayers in the county are Negroes; that the county had a population in 1960 of 10,206 people over the age of 21 years, of whom 4,706 were male, with 2,004, or 42.6% of this latter number being Negroes; that 33 prospective jurors were drawn for grand jury service for the term of court during which petitioners were indicted, three being Negroes, of whom one actually served on the grand jury of 19 persons; that a venire of 90 persons was used for the selection of the petit jury which tried petitioners, of which number at least seven were Negroes; and, that no Negro was accepted on the petit jury.
>
> "Furthermore, it is obvious that the 1964 tax digest was required to be made under the same segregated system as were the previous digests, and suffered the same deficiency. Indeed, the State employed the same

procedure which it concedes resulted in discrimination in the petitioners' first trial."

The constitutional principle enunciated in *Whitus* had a long somewhat staccato evolution but is possessed of deep roots in our juridical heritage. Our careful review of the authorities evidences a clearly delineated tracing of the original pronouncement regarding the intent and ambit of the Fourteenth Amendment in the historic *Slaughter-House Cases* to the current body of law surrounding the instant issue. This distinct, tenacious fibre has interwoven itself into each subsequent opinion until through the careful process of stare decisis one is currently appraised of the ruling in *Whitus* and the subsequent decisions hereinafter noted.

In tracing this evolutionary process, in an attempt to establish a historical precedent interpretable as a guide to the current posture of the law governing the issue of jury discrimination and the prerequisite prima facie evidence of same, a careful review of the origins of this doctrine produced the following cases of note.

In The *Slaughter-House Cases,* 83 U. S. (16 Wall.) 36, 21 L. Ed. 394 (1872), the Supreme Court considered the proposition: "Can any exclusive privileges be granted to any of its citizens, or to a corporation, by the legislature of a State?" Therein, the Court was initially defining the true spirit and meaning of the Thirteenth, Fourteenth and Fifteenth Amendments of the Constitution of the United States stating at page 67:

"We do not conceal from ourselves the great responsibility which this duty devolves upon us. No questions so far-reaching and pervading in their consequences, so profoundly interesting to the people of this country, and so important in their bearing upon the relations of the United States, and of the several States to each other and to the citizens of the States and of the United States, have been before this court during the official life of any of its present members."

The Court went on to express its opinion of the spirit and purpose, and to some extent the meaning of the above amend-

ments. It observed that of the first twelve amendments eleven were "practically contemporaneous" with the adoption of the Federal Constitution and the adoption of the twelfth in 1803 made it with the others "historical and of another age." The Court then noted that the history surrounding the then recently adopted Thirteenth, Fourteenth and Fifteenth Amendments "is fresh within the memory of us all, and its leading features, as they bear upon the matter before us, free from doubt." There followed an historical analysis of the background to the above amendments, "as that history relates to the general purpose which pervades them all." The Court's attention was focused upon the intent and ambit of the Fourteenth Amendment, noting that *Dred Scott v. Sandford,* 60 U. S. (19 How.) 393, 15 L. Ed. 572 (1856) was effectively overturned by observing that the Fourteenth Amendment's "main purpose was to establish the citizenship of the negro * * *." While directing its interest to the "privileges and immunities" section, the Court through its thorough treatment of the entire subject matter permanently etched upon the law that these amendments viewed in their historical context predicated that "* * * no one can fail to be impressed with the one pervading purpose found in them all, lying at the foundation of each, and without which none of them would have been even suggested; we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly-made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over him." (p. 71).

Seven years later, in *Strauder v. West Virginia,* 100 U. S. 303, 25 L. Ed. 664 (1879), the Court reviewed a statute of West Virginia controlling the selection of jurors, which read:

> "All white male persons who are twenty-one years of age and who are citizens of this State shall be liable to serve as jurors, except as herein provided." (p. 305).

In finding the statute violative of the Fourteenth Amendment, the Court, drawing upon the *Slaughter-House Cases,* stated that the Fourteenth Amendment "was designed to assure to the colored race the enjoyment of all the civil rights that

under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States." (p. 306). To fulfill this purpose, the Fourteenth Amendment "is to be construed liberally, to carry out the purposes of its framers." (p. 307). The ordained purpose is but a declaration "* * * that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws * * *." While commenting that this amendment is directed toward the colored race the court noted the ambit of same is inclusive of whites also observing that "* * * if a law should be passed excluding all naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the amendment." (p. 308). The "aim was against discrimination because of race or color" and "its design was to protect an emancipated race, and to strike down all possible legal discrimination against those who belong to it." (p. 310).

The Court went on to state at page 310:

> "The Fourteenth Amendment makes no attempt to enumerate the rights it designed to protect. It speaks in general terms, and those are as comprehensive as possible. Its language is prohibitory; but every prohibition implies the existence of rights and immunities, prominent among which is an immunity from inequality of legal protection, either for life, liberty, or property. Any State action that denies this immunity to a colored man is in conflict with the Constitution."

Having commented upon the purpose and qualitative importance of a jury and the essentiality of its non repugnance to the principle enunciated in the Fourteenth Amendment, the Court stated at page 308:

> "The right to a trial by jury is guaranteed to every citizen of West Virginia by the Constitution of that State, and the constitution of juries is a very essential part of the protection such a mode of trial is intended to secure. The very idea of a jury is a body of men composed of the peers or equals of the person whose

rights it is selected or summoned to determine; that is, of his neighbors, fellows, associates, persons having the same legal status in society as that which he holds." Quoting Blackstone, the Court noted this right is the "grand bulwark of his liberties."

The Court found that the petitioner "was entitled to immunity from discrimination against him in the selection of jurors, because of their color * * *" and there were "sufficient facts to exhibit a denial of that immunity, and a denial by the statute law of the State." (p. 312).

That same year, in *Virginia v. Rives,* 100 U. S. 313, 25 L. Ed. 667 (1879), the Court, discussing jury selection, stated at pages 322-23:

"It *is* a right to which every colored man is entitled, that, in the selection of jurors to pass upon his life, liberty, or property, there shall be no exclusion of his race, and no discrimination against them because of their color."

However:

"A mixed jury in a particular case is not essential to the equal protection of the laws, and the right to it is not given by any law of Virginia, or by any Federal statute. It is not, therefore, guaranteed by the Fourteenth Amendment * * *."

In *Ex Parte Virginia,* 100 U. S. 339, 25 L. Ed. 676 (1879), a judge had been indicted, in his capacity as the legal officer charged with selection of jurors, in that in 1878 he "did then and there exclude and fail to select as grand and petit jurors certain citizens * * *, of African race and black color, said citizens possessing all other qualifications prescribed by law, * * * on account of their race, color, and previous condition of servitude, and for no other reason * * *." (p. 340). In rejecting the contention that the Fourteenth Amendment is a direct interference by the Federal government with State rights, the Court noted that that amendment was addressed to the States and stated at page 346-47:

"It is said the selection of jurors for her courts and the administration of her laws belong to each State; that they are her rights. This is true in the general. But in exercising her rights, a State cannot disregard the limitations which the Federal Constitution has applied to her power. Her rights do not reach to that extent."

Furthermore:

"A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws."

The Court further elaborated upon its rejection of petitioner's contention that the Fourteenth Amendment unconstitutionally invaded State rights by quoting Chief Justice Taney's statement "that a power vested in the United States to inflict any punishment for neglect or refusal to perform the duty required by the act of Congress 'would place every State under the control and dominion of the general government, even in the administration of its internal concerns and reserved rights'." (p. 347). And observed, "[b]ut the Constitution now expressly gives authority for congressional interference and compulsion in the cases embraced within the Fourteenth Amendment." (p. 348). Therefore, a State statute cannot bestow the authority "when selecting jurors, from whom a panel might be drawn * * *, to exclude all colored men merely because they were colored." (p. 348).

In *Neal v. Delaware,* 103 U. S. 370, 26 L. Ed. 567 (1880), the Court found a prima facie case of denial of the equal protection of the laws guaranteed by the Fourteenth Amendment and reversed, stating at page 397:

"The showing thus made, including, as it did, the fact (so generally known that the court felt obliged to take judicial notice of it) that no colored citizen

had ever been summoned as a juror in the courts of the State,—although its colored population exceeded twenty thousand in 1870, and in 1880 exceeded twenty-six thousand, in a total population of less than one hundred and fifty thousand,—presented a *prima facie* case of denial, by the officers charged with the selection of grand and petit jurors, of that equality of protection which has been secured by the Constitution and laws of the United States. It was, we think, under all the circumstances, a violent presumption which the State court indulged, that such uniform exclusion of that race from juries, during a period of many years, was solely because, in the judgment of those officers, fairly exercised, the black race in Delaware were utterly disqualified, by want of intelligence, experience, or moral integrity, to sit on juries."

In *Norris v. Alabama,* 294 U. S. 587, 55 S. Ct. 579, 79 L. Ed. 1074 (1935), the Supreme Court, speaking through Mr. Chief Justice Hughes, quoted at page 589, *Carter v. Texas,* 177 U. S. 442, 447, 20 S. Ct. 687, 44 L. Ed. 839 (1900), regarding exclusion from grand jury service:

"Whenever by any action of a State, whether through its legislature, through its courts, or through its executive or administrative officers, all persons of the African race are excluded, solely because of their race or color, from serving as grand jurors in the criminal prosecution of a person of the African race, the equal protection of the laws is denied to him, contrary to the Fourteenth Amendment of the Constitution of the United States. *Strauder v. West Virginia,* 100 U. S. 303, 25 L. Ed. 664; *Neal v. Delaware,* 103 U. S. 370, 397, 26 L. Ed. 567, 574; *Gibson v. Mississippi,* 162 U. S. 565, 16 S. Ct. 904, 40 L. Ed. 1075."

The Court noted the above principle is "equally applicable to a similar exclusion of Negroes from service on petit juries."

The Court found that a prima facie case was established by the evidence noted at page 591 that:

"* * * 'in a long number of years no negro had been
called for jury service in that county.' It appeared that
no negro had served on any grand or petit jury in that
county within the memory of witnesses who had lived
there all their lives. Testimony to that effect was given
by men whose ages ran from fifty to seventy-six years.
Their testimony was uncontradicted. It was supported
by the testimony of officials. The clerk of the jury com-
mission and the clerk of the circuit court had never
known of a negro serving on a grand jury in Jackson
county. The court reporter, who had not missed a ses-
sion in that county in twenty-four years, and two
jury commissioners testified to the same effect. One of
the latter, who was a member of the commission which
made up the jury roll for the grand jury which found
the indictment, testified that he had 'never known of a
single instance where any negro sat on any grand or
petit jury in the entire history of that county'."

The evidence adduced below established that the names of
six Negroes were added to the end of the produced venire list
after red lines were drawn to close off the list. Expert testi-
mony established that "these names were superimposed on the
red lines, that is, that they were written after the lines had
been drawn." There was no rebuttal evidence on this point.
Other evidence established that "col." was placed next to the
names of the colored candidates on the preliminary list of po-
tential jurors. The thrust of the rebuttal was by three jury
commissioners to the effect that Negroes were not excluded from
the general list and that in compiling the jury roll neither race
nor color were considered. In finding that this evidence failed
to rebut the "strong prima facie case," the Court stated at page
598 that:

"If, in the presence of such testimony as defendant
adduced, the mere general assertions by officials of
their performance of duty were to be accepted as an
adequate justification for the complete exclusion of
negroes from jury service, the constitutional provision

—adopted with special reference to their protection
—would be but a vain and illusory requirement."

In *Pierre v. Louisiana,* 306 U. S. 354, 59 S. Ct. 536, 83 L. Ed. 757 (1939), an opinion by Justice Black, the lower court had granted petitioner's timely motion to quash his indictment and the general venire from which the Grand Jury which indicted him and the Petit Jury Panel scheduled to try him had been drawn. The evidence relied upon was that petitioner was a Negro indicted for murder of a white man; that at least one-third of the population from whence the general venire was drawn were Negroes but no Negroes were named therein; that the state officers had "deliberately excluded therefrom the names of any Negroes qualified * * *" and had "systematically, unlawfully and unconstitutionally excluded Negroes" for at least 20 years "solely and only because of their race or color;" ergo petitioner's constitutional rights to equal protection stood violative of the Louisiana Constitution and the Fourteenth Amendment of the Federal Constitution. Petitioner offered testimony of twelve witnesses. The State did not proffer any rebuttal. Based upon this evidence, the trial judge quashed the Petit Jury Panel and venire, emptied and purged the selection box and refilled same wherefrom a new Petit Jury Panel was drawn composed of both whites and Negroes. However, the trial judge allowed the indictment by the former general venire drawn Grand Jury to stand. Subsequently, the Louisiana Supreme Court ruled "that the trial court's finding of discrimination was erroneous."

The evidence adduced below, noted at page 359, established that:

"* * * from 1896 to 1936 no negro had served on the Grand or Petit Juries in the Parish; that a venire of three hundred in December, 1936, contained the names of three negroes, one of whom was then dead, one of whom (D. N. Dinbaut) was listed on the venire as F. N. Dinfant; the third—called for Petit Jury service in January, 1937—was the only negro who had ever been called for jury service within the memory of the Clerk of the court, the Sheriff, or any other

witnesses who testified; and that there were many negro citizens of the Parish qualified under the laws of Louisiana to serve as Grand or Petit Jurors. According to the testimony, negroes constituted 25 to 50 per cent of a total Parish population of twelve to fifteen thousand. The report of the United States Department of Commerce, Bureau of the Census, for 1930, shows that the total Parish population was fourteen thousand and seventy-eight, 49.7 per cent native white, and 49.3 per cent negro. In a total negro population (ten years old and over) of five thousand two hundred and ninety, 29.9 per cent were classified by the census as illiterate."

The Court observed that the 1930 census reflected a 70 per cent literacy rate among the negro population and it was "established beyond question that the majority of the negro population could read and write." Furthermore, the challenged Grand Jury was not drawn from the general venire but from a "supplemental list which itself contained no names of negroes" and the evidence was uncontradicted that "no negro had been selected for Grand Jury service in the Parish within the memory of any of the witnesses who testified on that point." The Court viewed the evidence presented as constituting a "strong *prima facie* showing that negroes had been systematically excluded—because of race—from the Grand Jury and the venire from which it was selected." (p. 361).

In *Smith v. Texas*, 311 U. S. 128, 61 S. Ct. 164, 85 L. Ed. 84 (1940), it had been adduced below that Negroes constituted more than 20% of the population and nearly 10% of the poll tax payers and that from three to six thousand Negroes were qualified by Texas statutes for grand jury service; furthermore, additional evidence encompassing the years 1931 through 1938 established, as noted at page 129, that:

"* * * only 5 of the 384 grand jurors who served during that period were negroes; that of 512 persons summoned for grand jury duty, only 18 were negroes; that of these 18, the names of 13 appeared as the last name on the 16 man jury list, the custom being to se-

lect the 12 man grand jury in the order that the names appeared on the list; that of the five negroes summoned for grand jury service who were not given the number 16, 4 were given numbers between 13 and 16, and 1 was number 6; that the result of this numbering was that of the 18 negroes summoned, only 5 ever served, whereas 379 of the 494 white men summoned actually served; that of 32 grand juries empanelled, only 5 had negro members, while 27 had none; that of these 5, the same individual served 3 times, so that only 3 individual negroes served at all; that there had been no negroes on any of the grand juries in 1938, the year petitioner was indicted; that there had been none on any of the grand juries in 1937; that the service of negroes by years had been: 1931, 1; 1932, 2; 1933, 1; 1934, 1; 1935, none; 1936, 1; 1937, none; 1938, none."

Dismissing chance and accident alone as the responsible elements for the above development and rejecting the State's attempted rebuttal of petitioner's prima facie case by urging that there was "no arbitrary or systematic exclusion" relying upon the testimony of two of the three commissioners to the effect that while the subject had been discussed, no Negroes had been selected, but said failure to select Negroes was, according to one commissioner, because "they did not know the names of any who were qualified and the other said that he was not personally acquainted with any member of the Negro race." Furthermore, this testimony only accounted for "drawing 1 out of the 32 jury panels discussed in the record." Finally, the Court observed at page 132:

"What the Fourteenth Amendment prohibits is racial discrimination in the selection of grand juries. * * * If there has been discrimination, whether accomplished ingeniously or ingenuously, the conviction cannot stand."

*Hill v. Texas*, 316 U. S. 400, 62 S. Ct. 1159, 86 L. Ed. 1559 (1942) followed the ruling in *Neal v. Delaware, supra* (103 U. S. 370), and found a prima facie case fully established

by a showing that the jury commission had summoned members of the white race for service on the grand jury "with whom they were acquainted and whom they knew to be qualified to serve." (p. 402). The commission testified further that they had "no prejudice against the colored race; that they discussed the possibility of selecting negroes to serve, and that they knew negroes in the county." (p. 402). They made no inquiry into the qualification of the negroes. An assistant district attorney for the county, having resided in the county for 27 or 28 years and having served as a judge of the criminal court for 16 years" never knew of a negro being called to serve on a grand jury in the county. Additional evidence showed that no citations had issued for negroes to serve on the grand jury; that one negro resident for 54 years had often been called for petit jury service but had never been called for grand jury service nor knew any negro who had; two negro residents for 25 years never knew of a negro called for grand jury service; of 66,000 poll taxpayers, 8000 were negro; the 1940 census showed a total population of 398,564 with 61,605 negroes, of which 19,133 were males 21 or over; 1930 census showed 7.5% of the negroes illiterate; the 1940 census also showed 17,263 negro males 25 or over of which 16,107 had attended grade school or higher, with 7,979 having attended grade school from 5 to 8 years, 1,970 high school for 1 to 3 years and 1,124 for 4 years, 466 college from 1 to 3 years and 284 for 4 years or more.

The Court stated at page 404 that:

"Discrimination can arise from the action of commissioners who excluded all negroes whom they do not know to be qualified and who neither know nor seek to learn whether there are in fact any qualified to serve. In such a case, discrimination necessarily results where there are qualified negroes available for jury service. With the large number of colored male residents of the county who are literate, and in the absence of any countervailing testimony, there is no room for inference that there are not among them householders of good moral character, who can read and write, qualified and available for grand jury service."

In reversing, the Court stated that "* * * it is our duty as well as the State's to see to it that throughout the procedure for bringing him to justice he shall enjoy the protection which the Constitution guarantees." (p. 406). Furthermore, as noted at page 406:

"Equal protection of the laws is something more than an abstract right. It is a command which the State must respect, the benefits of which every person may demand. Not the least merit of our constitutional system is that its safeguards extend to all—the least deserving as well as the most virtuous."

In *Akins v. Texas*, 325 U. S. 398, 65 S. Ct. 1276, 89 L. Ed. 1692 (1945), the Court, speaking through Mr. Justice Reed, affirmed the lower court in finding that the evidence presented failed to establish a deliberate and intentional limitation of the number of Negroes on the grand jury list. The Court at page 403 stated:

"Fairness in selection has never been held to require proportional representation of races upon a jury. *Virginia v. Rives*, 100 U. S. 313, 322-23; *Thomas v. Texas*, 212 U. S. 278, 282. Purposeful discrimination is not sustained by a showing that on a single grand jury the number of members of one race is less than that race's proportion of the eligible individuals. The number of our races and nationalities stands in the way of evolution of such a conception of due process or equal protection. Defendants under our criminal statutes are not entitled to demand representatives of their racial inheritance upon juries before whom they are tried. But such defendants are entitled to require that those who are trusted with jury selection shall not pursue a course of conduct which results in discrimination 'in the selection of jurors on racial grounds.' *Hill v. Texas, supra,* 404. Our directions that indictments be quashed when Negroes, although numerous in the community, were excluded from grand jury lists have been based on the

theory that their continual exclusion indicated discrimination and not on the theory that racial groups must be recognized. *Norris v. Alabama, supra; Hill v. Texas, supra; Smith v. Texas, supra.* The mere fact of inequality in the number selected does not in itself show discrimination. A purpose to discriminate must be present which may be proven by systematic exclusion of eligible jurymen of the proscribed race or by unequal application of the law to such an extent as to show intentional discrimination."

*Cassell v. Texas,* 339 U. S. 282, 70 S. Ct. 629, 94 L. Ed. 839 (1950) followed *Hill v. Texas, supra* and narrowed its consideration to the period from the time of that decision on June 1, 1942 and November, 1947, when the petitioner was indicted. During this period there were 21 grand juries of 252 members of the panels and 17, or 6.7% were Negroes. This discrepancy can be partially explained by the qualifications set by Texas for service on the grand jury. However, the Court observed that an individual's qualifications are "not hard to ascertain, and with no evidence to the contrary, we must assume that a large proportion of the Negroes of Dallas County met the statutory requirements for jury service." (p. 289).

However, the Court reaffirmed, at page 287, that proportional representation is forbidden and that an accused is "entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race." The Court then stated at page 289 that:

"When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race or color."

Finding that there was a failure of compliance with this principle, the Court determined that "the result has been racial discrimination." Discrimination does not depend upon "systematic exclusion continuing over a long period and practiced by a succession of jury commissioners," but "it is enough to have direct evidence based on the statements of the jury commissioners in the very case." In fact, as stated at page 290:

"Discrimination may be proved in other ways than by evidence of long-continued unexplained absence of Negroes from many panels. The statements of the jury commissioners that they chose only whom they knew, and that they knew no eligible Negroes in an area where Negroes made up so large a proportion of the population, prove the intentional exclusion that is discrimination in violation of the petitioner's constitutional rights."

In *Avery v. Georgia,* 345 U. S. 559, 73 S. Ct. 891, 97 L. Ed. 1244 (1953), the jury commissioners selected the names of prospective jurors from the county tax returns and printed a list of the selected names placing the names of white persons on white tickets and the names of Negroes on yellow tickets. The tickets were then placed in a jury box for drawing. After the drawing the tickets were handed to a sheriff who entrusted them to a clerk whose duty was to "arrange" the tickets and type a final list of those to serve. Not a single Negro appeared on the instant panel though many were available. The above practice of using the different colored tickets to differentiate white from Negroes was found to make "it easier for those to discriminate who are of a mind to discriminate." This evidence established a prima facie case, which the State failed to rebut thus dictating a reversal.

In *Williams v. Georgia,* 349 U. S. 375, 75 S. Ct. 814, 99 L. Ed. 1161 (1955), the Court found a continuation of the practice found in *Avery, supra,* and remanded for reconsideration although procedurally Williams, unlike Avery, had failed to object to the array when the jury was presented to him, as was required by Georgia procedure. Of the 120 jurors involved 4 were Negroes, three were subsequently excused for cause and one peremptorily challenged by the State, so no Negroes were on the jury trying Williams.

In *Hernandez v. Texas,* 347 U. S. 475, 74 S. Ct. 667, 98 L. Ed. 866 (1954), the petitioner maintained a showing, as noted at pages 480-81, that:

"* * * 14% of the population of Jackson County were persons with Mexican or Latin-American sur-

names and that 11% of the males over 21 bore such names. The County Tax Assessor testified that 6 or 7 percent of the freeholders on the tax rolls of the County were persons of Mexican descent. The State of Texas stipulated that 'for the last twenty-five years there is no record of any person with a Mexican or Latin-American name having served on a jury commission, grand jury or petit jury in Jackson County'."

The Court found that the petitioner "met the burden of proof imposed in *Norris v. Alabama, supra,*" and that the State's rebuttal testimony that the only objective had been "to select those whom they thought were best qualified," was inadequate. In reversing, the Court observed that "it taxes our credulity to say that mere chance resulted in there being no members of this class among the over six thousand jurors called in the past 25 years. The result bespeaks discrimination, * * *." (p. 482).

In *Reece v. Georgia,* 350 U. S. 85, 76 S. Ct. 167, 100 L. Ed. 77 (1955), a "strong showing of systematic exclusion" was established by the uncontradicted evidence, noted at page 87, that:

> "* * * no Negro had served on the grand jury in Cobb County for the previous 18 years; the 1950 census showed that the county had a white population of 55,-606 and a Negro population of 6,224; the same census showed a population of 16,201 male white citizens over 21 years of age, and 1,710 male Negro citizens over 21 years of age. Petitioner's motion alleged, and this was not contradicted, that there were 534 names on the grand-jury list and of this number only six were Negroes. Of the six Negroes, one did not reside in the county and the other five testified in this proceeding. Two were over 80 years of age: one was partially deaf and the other in poor health. The remaining three were 62 years of age. Each of the witnesses had lived in the county for at least 30 years. None had ever served on a grand jury nor heard of any other Negro serving on a grand jury in the county. The Clerk and Deputy Clerk of the court testified that the jury

boxes had been revised in 1952, that there was no dis-
crimination or systematic exclusion of Negroes from
the grand-jury list, that six Negroes were on the list,
and that neither had ever known a Negro to serve on a
grand jury in Cobb County."

The Georgia Supreme Court's finding that the petitioner's
challenge to the grand jury was untimely under the practice of
that State as it was not made prior to indictment was reversed
and remanded when the record revealed petitioner was ignorant
of this requirement and that he lacked counsel. The Supreme
Court stated that "the right to object to a grand jury presup-
poses an opportunity to exercise that right." (p. 89).

In *Eubanks v. Louisiana,* 356 U. S. 584, 78 S. Ct. 970, 2
L. Ed. 2d 991 (1958), Justice Black observed that "[i]n an
unbroken line of cases stretching back almost 80 years this
Court has held that a criminal defendant is denied the equal
protection of the laws guaranteed by the Fourteenth Amend-
ment if he is indicted by a grand jury or tried by a petit jury
from which his race has been excluded because of their race."
(p. 585).

That Court was satisfied that systematic exclusion of Negroes
from grand juries had occurred based upon the evidence, noted
at page 586, that:

"Although Negroes comprise about one-third of the
population of the parish, the uncontradicted testimony
of various witnesses established that only one Negro
had been picked for grand jury duty within memory.
And this lone exception apparently resulted from the
mistaken impression that the juror was white. From
1936, when the Commission first began to include Ne-
groes in the pool of potential jurors, until 1954, when
petitioner was indicted, 36 grand juries were selected
in the parish. Six or more Negroes were included in
each list submitted to the local judges. Yet out of the
432 jurors selected only the single Negro was chosen."

In *Arnold v. North Carolina,* 376 U. S. 773, 84 S. Ct. 1032,
12 L. Ed. 2d 77 (1964), testimony of the county tax super-

visor established that 12,250 white persons and 4,819 Negroes resided in the county, with the poll tax reflecting 5,583 white men and 2,499 Negro men. Furthermore, the clerk of the court testified that while as many as four or five Negroes had been on the regular jury panel from which the grand jury was selected, in his 24 years as clerk he could only remember one Negro serving on a grand jury, another having been selected but excused. The State offered no evidence. Relying upon *Norris v. Alabama, supra,* and *Eubanks v. Louisiana, supra,* the Court reversed finding that a prima facie case of systematic exclusion had been established and not rebutted.

In the three recent decisions of *Sims v. Georgia,* 389 U. S. 404, 88 S. Ct. 523; *Coleman v. Alabama,* 389 U. S. 22, 88 S. Ct. 2, and *Jones v. Georgia,* 389 U. S. 24, 88 S. Ct. 4, the Supreme Court of the United States again enunciated the principles which culminated in *Whitus, supra.*

In *Jones v. Georgia, supra,* the Georgia Supreme Court had attempted to distinguish it from *Whitus* because "public officers are presumed to have discharged their sworn official duties. * * * Under the testimony in this case we cannot assume that the jury commissioners did not eliminate prospective jurors on the basis of their competency to serve, rather than because of racial discrimination." In reversing and remanding, the Supreme Court stated that the burden upon the State to explain " 'the disparity between the percentage of Negroes on the tax digest and those on the venire's,' *Whitus, supra,* 385 U. S. at 552, 87 S. Ct. at 647, was not met by the Georgia Supreme Court's reliance on the stated presumptions." The prima facie case was established by evidence of a 20 percent composition of Negroes on the tax digests and a five percent composition of Negroes on the venires.

In *Coleman v. Alabama, supra,* the Court noted that "it appeared that no Negro served on the grand jury which indicted or the petit jury which convicted petitioner. It further appeared that up to the time of petitioner's trial, no Negro had ever served on a grand jury panel and few, if any, Negroes had served on petit jury panels." This evidence was found to constitute a prima facie case of denial of equal protection. The Alabama Supreme Court's observation that "that disparity can be explained by a

number of other factors" in face of the fact that the only factors mentioned were "that Negroes had moved away from the county and that some may have been under the statutory disqualification of having suffered a felony conviction," failed to constitute a sufficient rebuttal of the prima facie case established by petitioner and therefore dictated a reversal and remand.

In *Sims v. Georgia, supra,* the Court stated "that the grand and petit lists were drawn from the county tax digests which separately listed taxpayers by race in conformity with the then existing Georgia law. Negroes constituted 24.4% of the individual taxpayers in the county. However, they amounted to only 4.7% of the names on the grand jury list and 9.8% of the names on the traverse jury list from which petitioner's grand and petit juries were selected." This evidence evolved a successful prima facie case which the State attempted to rebut with the testimony of one jury commissioner "that he or one of the other commissioners knew personally every qualified person in the county and did not discriminate in selecting names for the jury list." The Court volunteered that the facts of this case make it "virtually indistinguishable" from *Whitus, supra.* The Court reversed and remanded.

In striving to assure that all persons truly stand equal before the laws, the pervading directive enunciated throughout the aforenoted cases is that systematic exclusion and, or token inclusion stand violative of the Fourteenth Amendment. This protection permeates the entire process of jury selection and is inclusive of both Grand and Petit Jury panels. As observed, the original interpretation in the *Slaughter-House Cases, supra,* that the Fourteenth Amendment's "main purpose was to establish the citizenship of the Negro," was drawn upon in *Strauder v. West Virginia, supra,* to void a statute barring Negroes from the right to serve as jurors. However, a mixed jury was not viewed as essential to equal protection. *Virginia v. Rives,* 100 U. S. 313. The Court reminded the States that the Fourteenth Amendment had placed limitations upon State activity in this area and authorized congressional interference and compulsion. *Ex Parte Virginia, supra.* The burden of proving the existence of purposeful discrimination rests with the petitioner. *Tarrance v. Florida, supra; Whitus v. Georgia, supra.* However, once a

prima facie case is made out the burden shifts to the prosecution. *Whitus v. Georgia, supra.* The aforenoted cases constitute an illustrative guide to the factors of consideration in reaching a determination of the prima facie posture. In 1880, *Neal v. Delaware, supra,* set forth the manner and pattern of proof necessary to constitute a prima facie showing of denial of equal protection and due process. Thus, with *Neal v. Delaware, supra,* the law was settled barring the States from practicing racial discrimination in the selection of jurors. That manner of prima facie proof evidence in *Neal, supra,* has been recognized and faithfully followed in those cases subsequently advanced on that theory. See *Norris v. Alabama, supra; Pierre v. Louisiana, supra; Smith v. Texas, supra; Hill v. Texas, supra; Cassell v. Texas, supra; Avery v. Georgia, supra; Williams v. Georgia, supra; Hernandez v. Texas,* 347 U.S. 475; *Reece v. Georgia, supra; Eubanks v. Louisiana, supra; Arnold v. North Carolina, supra; Whitus v. Georgia, supra.* The segregation of jurors by race, assigning different colored slips for the names of white and colored persons, clearly constitutes a satisfactory showing of a prima facie case. *Avery v. Georgia, supra.* The cases noted above established that evidence of unexplained exclusion extending over a long period of time and practiced by a succession of jury commissioners supported by substantial percentage variations of qualified Negroes available and those called to serve, and those selected to serve effectively establishes a prima facie showing. However, it is equally clear that discrimination, apart from such a showing, may exist where supported by instant evidence of unexplained disparity between available qualified Negroes and those actually on the venires. *Cassell v. Texas, supra.* While proportional representation has been specifically rejected, *Virginia v. Rives, supra,* at pages 322-323; *Adkins v. Texas, supra; Cassell v. Texas, supra,* at page 287; *Hernandez v. Texas, supra,* at page 482; it is nevertheless clear that the Supreme Court closely scrutinizes the variable percentages evidenced in the presented case to assist in a determination of the existence of either exclusion or inclusion.[1] Naturally, the pro-

---

1. It is of some assistance to observe that in examination of the element of "probability" involved, *Whitus v. Georgia, supra,* directed

tection afforded does not direct itself to any one race or minority but to all persons.

In the instant case, the appellant urges that his challenge of the entire array of the jury, reciting the comparatively few Negroes selected in the original number of names from which the panels were derived, establishes a prima facie case that the jury was improperly drawn and impaneled. It was stipulated that 14 of 400 prospective jurors were of the Negro race and that one Negro served on the Grand Jury in November 1965 and that a total of six actually served on the Petit Juries during 1965 and 1966. At trial, one Negro served as a juror and one as an alternate. This was the entire import of the appellant's evidence which purports to establish the prima facie case and consequential shift of the burden as alluded to in *Clark v. Allgood, supra,* and *Whitus v. Georgia, supra.* These bare facts and figures, without more, do not bring this case within the ambit of the *Whitus* and *Clark* and other cited cases so as to constitute a prima facie case of discrimination.

In *Grayson v. State,* 1 Md. App. 548, 555, 232 A. 2d 284 (1967), we stated that:

> "Unless the absence of Negroes from a jury panel is proven by competent evidence to be by purposeful discrimination or design, appellant's bald assertion that he had been denied a fair and impartial trial will not be sustained. See *Giles v. State,* 229 Md. 370, 183 A. 2d 359 (1961) ; *Jackson v. State,* 180 Md. 658, 26 A. 2d 815 (1942) ; *Zimmerman v. State,* 191 Md. 7, 59 A. 2d 675 (1948) ; aff'd 336 U. S. 901 (1949) ; *U. S. ex rel. Jackson v. Brady,* 133 F. 2d 476 (4th Cir. 1943), cert. den. 319 U. S. 746 (1943), reh. den. 319 U.S. 784 (1943) ; *Swain v. Alabama,* 380 U. S. 202, 13 L. Ed. 2d 759, 85 S. Ct. 824 (1965)."

On the record before us, therefore, we find that the appellant failed to establish a factual base upon which to establish

---

attention to Finkelstein, The Application of Statistical Decision Theory to the Jury Discrimination cases, 80 Harv. L. Rev. 338 (1966).

a prima facie case and that the mere raising of a variation between the number of Negro and white jurors, in and of itself alone, is not sufficient to constitute an adequate showing of the prerequisite competent evidence of jury discrimination.

## II

At the conclusion of the State's case, a Motion for Judgment of Acquittal was made by the appellant, but denied by the trial court. Subsequent thereto, the appellant took the stand in his own behalf and thus withdrew his motion. Maryland Rules of Procedure 755 (b) ; *Lucas v. State,* 2 Md. App. 590, 592, 235 A. 2d 780, 781 (1967) ; *Loker v. State,* 2 Md. App. 1, 19, 233 A. 2d 342 (1967). The motion was renewed at the close of the entire case. In reviewing the lower court's denial of a Motion for Judgment of Acquittal, made at the conclusion of the case, the review becomes a determination of the sufficiency of the evidence. See *Clarke v. State,* 238 Md. 11, 207 A. 2d 456 (1965) ; *Lucas v. State, supra; McGlothlin v. State,* 1 Md. App. 256, 261, 229 A. 2d 428 (1967).

The thrust of the appellant's argument is that the time lapse involved was insufficient for premeditation and to formulate a design to kill. Appellant further urges that his version of the incident was more credible than that of the eyewitness, Mrs. Wimberly, wife of the deceased.

Article 27, § 407 of the Annotated Code of Maryland (1967 Replacement Vol.), states :

"All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of wilful, deliberate and premeditated killing shall be murder in the first degree."

In *Hyde v. State,* 228 Md. 209, 215-216, 179 A. 2d 421 (1962), the Court of Appeals, speakng through Judge Prescott, stated :

" 'Premeditated' means that the killing must have been meditated, planned in the mind, beforehand ; that the design to kill must have preceded the killing by an appreciable length of time, time enough to deliberate ; and in order to justify a conviction of first de-

gree murder, the trier of facts must find the actual intent (wilfulness), the fully formed purpose to kill (deliberation), with enough time for deliberation and premeditation to convince the trier of facts that this purpose is not the immediate offspring of rashness and impetuous temper (lack of deliberation and premeditation), but that the mind has become fully conscious of its own design. Although the design to kill must precede the killing by some appreciable length of time, that time need not be long. If the killing be not the instant effect of impulse, if there be hesitation or doubt to overcome, a choice made as the result of thought, however short the struggle between the intention and the act, it is sufficient to characterize the crime as deliberate and premeditated murder. *Cummings v. State,* 223 Md. 606, 165 A. 2d 886; *Faulcon v. State,* 211 Md. 249, 126 A. 2d 858; *Dunn v. State,* 226 Md. 463, 174 A. 2d 185; *Chisley v. State,* 202 Md. 87, 106, 95 A. 2d 577. And the question of premeditation must be determined by the facts of each particular case. *Cummings v. State; Chisley v. State,* both *supra.*"

This rationale was adopted in *Leyva v. State,* 2 Md. App. 120, 123, 233 A. 2d 498 (1967).

Since the jury is in the favored position to evaluate and judge the attitude and demeanor of the witness, the credibility of a witness is a primary matter for the trier of facts to determine. *Hutchinson v. State,* 1 Md. App. 362, 367, 230 A. 2d 352, 354 (1967); *Borman v. State,* 1 Md. App. 276, 280, 229 A. 2d 440, 442 (1967). Furthermore, it is well settled that the trier of facts is under no obligation to believe the exculpatory testimony of the defendant. *Willis v. State,* 2 Md. App. 662, 665, 236 A. 2d 430 (1968); *Lucas v. State, supra,* 593; *Dunlap v. State,* 1 Md. App. 444, 447, 230 A. 2d 690, 691 (1967).

In the instant case, the appellant admitted shooting the deceased, but protested his innocence upon the theory of self-defense.

From the testimony, which the jury found to be credible, it was established that the appellant had been a guest at the de-

ceased's residence on the day of the shooting and had left after there had been a disturbance during the afternoon, had later telephoned the Wimberlys and inexplicably stated to Mrs. Wimberly, over the phone, that "I'm tired of this damn * * * [a vulgar expression]," and had then returned, uninvited and unexpected, to the Wimberly home and engaged in a conversation with the deceased and his wife which evolved into an argument and an ensuing altercation with the deceased, culminating in the shooting to death of the deceased by the appellant after the deceased had ordered the appellant out of his house and then raised a chair to accentuate his order. The testimony also established that the deceased was unarmed and that the appellant was angered over the deceased's comments that he and Coretha Thomas were unmarried. When the deceased got up off the bed, walked around the foot of the bed and picked up the chair, the appellant stated, "No Wimpey, I'm not afraid of you." Then, as Mrs. Wimberly started to leave the bedroom, she noted the appellant standing in front of an open door with a gun in his hand, pointed straight at the deceased. Mrs. Wimberly ran into her bedroom and then heard the shots. The appellant fled from the scene, disposed of his weapon and later turned himself in. We find from the above testimony that there was a sufficient inference drawn from this testimony to negate any notion that the killing was the offspring of rashness or impetuosity, or that it was the instant effect of impulse. See *Leyva v. State, supra.* This evidence supplied the jury with a sufficient basis to find the corpus delicti of first degree murder. *Hyde v. State, supra; Cummings v. State,* 223 Md. 606, 611-612, 165 A. 2d 886 (1960) ; *Faulcon v. State,* 211 Md. 249, 257, 258, 126 A. 2d 858 (1956) ; *Chisley v. State,* 202 Md. 87, 105-106, 95 A. 2d 577 (1953) ; *Hayes v. State,* 3 Md. App. 4, 10, 237 A. 2d 531 (1968).

"In trial before a jury this Court can review the sufficiency of the evidence, but this Court does not inquire into and measure the weight of the evidence but only determines whether there is any relevant evidence which could properly sustain a conviction." *Hayes v. State, supra; Banks v. State,* 2 Md. App. 373, 376, 234 A. 2d 798 (1967) ; *Culver v. State,* 1 Md. App. 406, 409, 230 A. 2d 361 (1967) ; *Quinn v. State,* 1 Md. App.

373, 375, 230 A. 2d 368 (1967); *Borman v. State, supra,* at 280; *Graef v. State,* 1 Md. App. 161, 228 A. 2d 480 (1967). In the instant case, there was legally sufficient evidence from which the jury could be fairly convinced beyond a reasonable doubt of the appellant's guilt.

*Judgment affirmed.*