Robert **SEWELL**

v.

**WARDEN, MARYLAND PEN-ITENTIARY.**

Civ. No. 14330.

United States District Court
D. Maryland.

Nov. 25, 1969.

William R. Leckemby, Jr. (court-appointed), Frederick, Md., for petitioner.

Alfred J. O'Ferrall, III, Asst. Atty. Gen., Baltimore, Md., for respondent.

THOMSEN, Chief Judge.

In this third habeas corpus proceeding filed in this Court by petitioner, he attacks the racial composition of the Frederick County grand jury which indicted him in the autumn of 1961 and the petit jury which convicted him of first degree murder in March 1962. The other points raised in the petition were abandoned at the hearing. Some of them were considered in an opinion of the Fourth Circuit (No. 9923, July 21, 1965, unre-

ported), affirming a decision of this Court. The instant case has been carefully and ably presented by court-appointed counsel. There is no dispute about the essential facts.

In 1960 Frederick County had a population of about 70,000, of whom 30,000 lived in the City of Frederick. The 1960 census showed 39,020 in the County qualified to vote, of whom 2,294, or 5.8%, were non-white. The County is divided into 26 election districts. Most of the Negroes lived in the City of Frederick.

During the period in question, 1961–1962, only one Judge was assigned to the Circuit Court for Frederick County. The Circuit Court held two jury terms: one in February, and one in September of each year. Shortly before each term enough names were drawn from a box containing 200 names to provide a grand jury of 23 and a petit jury panel of 25, after excuses.

The procedure by which the 200 names found their way into the box was described by Carl E. Holtz, who served as deputy clerk and court reporter. About 20 key men, living in various parts of the County, who were known to the judge or the deputy clerk, or both, were asked to send in names of prospective jurors. Two of the key men were Negroes. Both of them lived in the City of Frederick, but were acquainted with Negroes in other districts where there were an appreciable number of Negroes. The white key men sent in only white names. At some time during the period 1960–1964 letters were sent to the presidents of homemakers' groups and the masters of granges, asking them to send in names. Those organizations were white organizations. The names submitted by key men and others were kept in a jury data book by the deputy clerk. The race of the prospective jurors was shown in the jury data book, but not on the slips which were placed in the jury box.

About three weeks before the drawing of juries for each term, the deputy clerk reported to the judge the number of names remaining in the box, and they discussed together what names in the jury data book should be placed into the box to bring the number up to 200, and whether any names in the box should be deleted. The names suggested by the judge to be added to the list would be checked by the deputy clerk to be sure that they had not served during the previous ten years; if they had they would be excused. The judge would usually remind the deputy clerk that there should be "a number" of Negro names in the box. The number was never specified.

Approximately one-third of the names drawn would be excused for one reason or another. The percentage of Negroes excused was about the same as of whites.

During a period of five years, 1960 to 1964, inclusive, Negroes constituted 2.9% of the total number of jurors who served on the grand and petit juries. During the five terms from February 1960 through February 1962, the percentage who served was 3.3%. There was one Negro on the grand jury which indicted Sewell in 1961 and two Negroes on the petit jury panel of the February 1962 Term, during which he was tried. The percentage of Negroes on those grand and petit jury panels was, therefore, 4% and 8% respectively, as compared with a 5.8% of non-whites in the County.

The development of the law on the question at issue was fully discussed in United States v. Cohen, 275 F.Supp. 724 (D.Md.1967), aff'd sub nom. United States v. DiTommaso, 405 F.2d 385 (4 Cir. 1968), and in Brooks v. State, 3 Md. App. 485, 240 A.2d 114 (1967).

■ It has been recognized for many years that "a conviction cannot stand if it is based on an indictment of a grand jury or the verdict of a petit jury from which Negroes were excluded by reason of their race. * * * The burden is, of course, on the petitioners to prove the existence of purposeful discrimination, Tarrance v. Florida, 188 U.S. 519 (1903). However, once a prima facie case is made out the burden shifts to the prosecution." Whitus v. Georgia, 385 U.S. 545, 550, 87 S.Ct. 643, 646, 17 L.Ed.2d 599 (1967).

The evidence in this case shows that there was no purposeful or systematic exclusion of Negroes from the grand and petit juries during the period in question. Nor was there a mere token inclusion of Negroes. The difference between the percentage of Negroes in the County and the percentage in the jury box, on the grand jury and on the petit jury panel was not so great as to establish a prima facie case of purposeful discrimination. See Swain v. Alabama, 380 U.S. 202, 208–209, 85 S.Ct. 824, 13 L.Ed. 2d 759 (1965). The facts here are very different from those in Coleman v. Alabama, 389 U.S. 22, 88 S.Ct. 2, 19 L.Ed. 2d 22 (1967); Jones v. Georgia, 389 U.S. 24, 88 S.Ct. 4, 19 L.Ed.2d 25 (1967); Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967), and other cases which have applied the principles enunciated in *Whitus* and in *Swain.*

It is not required that every group have exact proportional representation on the jury panels. As the Fourth Circuit said in *DiTommaso,* supra:

" * * * The constitutional principle that juries must be selected from a fair cross-section of the community is now well-established. (citations omitted). While the cross-sectional concept is firmly imbedded in the law, the constitution does not require that the jury or jury venire be a statistical mirror of the community. (citations omitted)." 405 F.2d at 389.

The dictum in Cassell v. Texas, 339 U.S. 282, 287, 70 S.Ct. 629, 632, 94 L.Ed. 839 (1950), that an "accused is entitled to have charges against him considered by a jury in the selection of which there has been neither inclusion nor exclusion because of race", has not been literally followed by the Supreme Court nor by the Circuits. See Brooks v. Beto, 366 F.2d 1 (5 Cir. 1966). Rather it has "consistently treated Cassell as proscribing exclusion either by means of proportional or other predetermined limitation or by a failure of the selectors to acquaint themselves with qualified Negroes". *Brooks,* supra, at 21. There was no evidence of such exclusion or such failure in the present case.

The fact that the judge told the deputy clerk that there should be "a number" of Negro names in the jury box did not violate the duty not to discriminate in the selection of jurors. As the Fifth Circuit said in *Brooks:* "In a setting where the presence of the Negro race in the community structure sets in motion the constitutional duty to know, a juror selector could fulfill that duty only by being aware of that race and the steps reasonably needed to assure representation of that race in the 'universe' from which jurors are obtained." 366 F.2d at 24.

The use of a key man system is not per se unconstitutional. United States v. DiTommaso, supra, 405 F.2d at 390, and cases cited therein. It was the method recommended to federal courts by the Judicial Conference of the United States at the time petitioner was indicted and tried. United States v. Cohen, supra, 275 F.Supp. at 730 et seq. The key man system was subject to abuses, but the evidence in this case does not show any such abuses. As the Supreme Court said in Swain v. Alabama, 380 U.S. 202, 209, 85 S.Ct. 824, 830 (1965), "an imperfect system is not equivalent to purposeful discrimination based on race".[1]

Petitioner has failed to show any violation of his constitutional rights, and the relief requested must be denied.

It is so ordered.

1. It may be noted that the State of Maryland, like the federal government, has now adopted an entirely different method of selection. See ch. 408 of the Acts of 1969, to be codified as Art. 51, secs. 1–13, of the Annotated Code of Maryland.